# Wytheville.

## THOMAS FRANCIS GREEN, JR., ETC. V. ADELINE D. GREEN'S EXECUTORS.

### June 14, 1928.

Argued and submitted before Judge Holt took his seat.

1. WILLS—*Testamentary Capacity—Evidence Held Sufficient to Sustain Verdict—Case at Bar.*—The instant case was a will contest, the contestant contending that testatrix was wanting in testamentary capacity at the time of the execution of the will. Not a single witness testified that the testatrix was mentally unbalanced, or mentally incapable to making a will, at the time the will in question was executed. On the contrary, a number of witnesses testified that she was mentally sound, including the distinguished lawyer who drew and attested the will.

   *Held:* That on the question of mental capacity, the weight of the evidence sustained the verdict in favor of the proponents of the will.

2. WILLS—*Undue Influence—Evidence as to the Absence of Undue Influence Held to Sustain a Finding in Favor of Proponents of Will—Case at Bar.*—The instant case was a will contest, the contestant contending that testatrix was subjected to undue influence on behalf of the beneficiaries under the will. The evidence showed that testatrix was not a person who was susceptible to undue influence, and that neither the beneficiaries nor their husbands undertook to suggest to her what disposition she should make of her property in the will.

   *Held:* That on the question of undue influence, the weight of the evidence sustained the verdict in favor of the proponents of the will.

3. WILLS—*Contest of Will—Distribution of Estate Equally Among Next of Kin—Case at Bar.*—In the instant case, a will contest, appellant's complaint was that he was not allowed to share equally with the daughters of the testatrix under the will. He represented the interest of his father, a son of testatrix, in testatrix's estate, and it appeared that testatrix had surrendered to his father's estate about $45,500.00, which exceeded the one-fifth of the testatrix's estate which appellant would have received had he shared equally with testatrix's daughters. Besides, the testatrix had the right,

if she so desired, to distribute her estate in unequal amounts among her children and their descendants.

4. WILLS—*Contest—Instructions—Case at Bar.*—In the instant case, a contest of a will in which there was a verdict and decree in favor of the proponents of the will, a careful consideration of all the instructions granted satisfied the Supreme Court of Appeals that they were free from error, and that when read together, as they should have been, they fairly and sufficiently instructed the jury upon the law applicable to the case. It follows, therefore, that the appellant was not prejudiced by the court's refusal to give other instructions.

Appeal from a decree of the Chancery Court of the city of Richmond, in a will contest.    Decree for proponents of will.    Contestant appeals.

*Affirmed.*

The opinion states the case.

*R. E. Peyton, Jr.,* and *Smith & Gordon,* for the appellant.

*McGuire, Riely & Eggleston,* for the appellees.

WEST, J., delivered the opinion of the court.

This suit was instituted by Thomas Francis Green, Jr., by Margaret F. Batcheller, his mother and next friend, to contest the will of his grandmother, Adeline D. Green, deceased.

Adeline D. Green departed this life, testate, on February 27, 1924, leaving surviving her four daughters, Annie Chelf, wife of Lewis G. Chelf; Willie Chelf, wife of T. Wilbur Chelf; Mrs. Bessie Dunn, a widow; and Lena Howle, wife of Dr. Paul W. Howle; Thomas Francis Green, Jr., the only child of her son, Thomas Francis Green, deceased; and three other grandchildren, one the child of T. Wilbur and Willie Chelf

and two the children of Paul W. and Lena Howle. Robert B. Green, husband of Adeline D. Green, died in 1911. Thomas Francis Green departed this life, intestate, May 26, 1914, and his widow married Rev. Henry E. Batcheller in 1919.

During the life of her husband, on August 15, 1902, Adeline D. Green made a holograph will, by which she gave $12,000 to her husband; $2,000 to each of her grandchildren, and a few other small bequests to other persons, and provided that the residue of her estate be divided equally among her five children.

On November 12, 1912, her husband then being dead, Adeline D. Green made another holograph will, in which she gave $2,000 to each of her grandchildren, and directed, after providing for a few other small bequests, that the balance of her estate be divided among her children.

On the 12th day of June, 1915, Mrs. Green executed a third will by which she bequeathed to each of her grandchildren, including Thomas Francis Green, Jr., the sum of $2,000, and gave the residue of her estate to her four daughters, in equal shares. On the 11th day of August, 1915, she wrote a codicil on the back of this will, wholly in her own handwriting, in which she gives several small bequests to relatives and friends, and says: "In all other respects I hereby ratify and confirm my said will in every particular."

Adeline D. Green was a daughter of William D. Gibson, who left her a large estate for life, with remainder to her children or their descendants. She and her son, Thomas Francis Green, qualified as executors of William D. Gibson, deceased. For the last twenty years of his life, Thomas Francis Green managed the Gibson estate and attended to the business affairs of his mother. After his death she appointed her three

sons-in-law, Lewis G. Chelf, T. Wilbur Chelf and Dr. Paul W. Howle, a committee of agents to manage her affairs, and gave Lewis G. Chelf a power of attorney to act for her and in her name.   Lewis G. Chelf also acted as her agent in the management of her father's estate.

Thomas Francis Green failed to keep proper books and accounts showing which of the investments made by him belonged to him personally and which to his mother.   After his death the testatrix caused an accounting to be had between herself and her son's estate.   It was found that he had in hand $52,906.39 of earmarked securities belonging to the testatrix, and it was finally agreed that in addition thereto there "appeared to be a balance due from the estate of T. Francis Green to Adeline D. Green of about $140,000." Margaret D. Batcheller, administratrix of Thomas Francis Green, deceased, and mother of Thomas Francis Green, Jr., refused to pay this balance of $140,000 to the testatrix, and threatened to plead the statute of limitations, and a compromise agreement was entered into on June 23, 1915, by which she was allowed to settle the same in full by paying $94,500.

This settlement was pending and the testatrix had knowledge of the condition of the accounts between her son and herself before the will of 1915 was executed. On November 2, 1914, she wrote her son-in-law, L. G. Chelf, as follows:

"You have told me that Frank in his many and varied transactions got his investments considerably mixed with mine, and as a result his estate is indebted to me for a considerable amount.

"In looking over the statement you so carefully prepared for me, showing the amount of gifts to my several children from January 1, 1894, to May 1,

1914, it appears that I have not given to him an equal proportion, and I therefore direct in making the proposed adjustment that he be given credit for $10,000. This together with what has already been given him will in my opinion be eminently just to him, as well as all others concerned."

Adding the $94,500 to the amount of the earmarked securities, $52,906.39, the testatrix's estate was worth $147,406.39 in June, 1915, and had she died at that time, without making the will of June 12, 1915, the complainant, Thomas Francis Green, Jr., would have received one-fifth of that sum, or about $29,000.

When the testatrix died in 1924, the total amount which passed under her will of June 12, 1915, to her four daughters was $195,401.60. If that will had not been executed, Thomas Francis Green, Jr., would have received one-fifth of this amount, or $39,080.32, which is about $6,500 less than the $45,500 which the testatrix had conceded to his father's estate in the settlement above referred to.

The will was written by former Judge Daniel Grinnan of the Chancery Court of the city of Richmond, and he and Dr. William Gordon attested the will as subscribing witnesses. This is the will in controversy. The contestant attacked the will on the grounds of mental incapacity and undue influence.

The case was heard in the Chancery Court of the city of Richmond in 1926, before the Honorable Beverley T. Crump, and a jury, to whom was submitted an issue of *devisavit vel non.* The jury returned a verdict sustaining the will. The court entered a decree adjudging the paper writings of June 12, 1915, and August 11, 1915, to be the true last will and testa-

ment of Adeline D. Green, deceased. From that decree this appeal was allowed.

The petitioner assigns as error the action of the court, (1) in refusing to set aside the verdict of the jury and grant a new trial, and (2) in giving and refusing to give certain instructions.

It appears without contradiction that the testatrix went to Dumbarton, the country home of her daughter, Mrs. T. Wilbur Chelf, near Richmond, in April, 1915, for a visit of several months, and that while there she executed her will.

[1] On the question of mental capacity, the weight of the evidence sustains the contention of the proponents. Not a single witness testified that the testatrix was mentally unbalanced, or mentally incapable of making a will, at the time she executed the will or the codicil. On the contrary, a number of witnesses testified that she was mentally all right. Judge Grinnan, testifying to the circumstances under which the will was written and executed, says:

"The old lady was in her room lying down; she had been sick. I was taken into her room—I mean by the old lady, Mrs. Green—she greeted me very cordially. She was in a very cheerful, pleasant frame of mind. I had some preliminary conversation with her, as I always do. I regarded her mind, and regard it to-day, as perfectly clear. She began by telling me what— somebody got me a pen and ink and table and she began telling me exactly what she wanted put in her will. I wrote the paper exactly as the old lady told me; I may have changed the language to fit my own notion, but it is exactly what she told me. There was nobody else in the room. It was the summer time and everything was sitting open, but nobody was near at hand; the old lady and I were sitting there together. I wrote

exactly what she told me to write, it took me very little time, and after I had gotten through she read it and got up to sign it, and she made a signature that was not a very good one and then said she would improve on that, and she got in a better position and made a better signature. The will suited her exactly. Then Dr. Gordon came in, or I went for Dr. Gordon. I don't think anybody else was in the room at the time except Dr. Gordon and myself. She signed it and then Dr. Gordon and I signed it right at her bedside as witnesses, all three right there together. I had some further talk; I stayed there a little while. My relations with all of these people were very pleasant. I had done some little legal work for Mrs. Green some little time before. I had some further talk with her and came away. The old lady was a very pleasant old lady, she had beautiful manners and she was very nice to me. I regarded her mental condition as excellent; there was nothing in the world the matter with her mind that I could see, so much so that when after the old lady's death they asked me to come up here and prove the same will on the *ex parte* probate side of the court, I did that and did not hesitate to testify about the execution of the will by Mrs. Green in the presence of Dr. Gordon and myself. Now you see over on this side the codicil that Mrs. Green wrote; that I never saw until it came up here after her death."

Doctor Gordon, the other subscribing witness, died before the will was offered for probate.

H. L. Harwood, who saw her often, testified that he talked with the testatrix on Thursday or Friday night, June 10th or 11th, the will being made on the 12th, and that her "mental condition was all right." Mrs. Nannie W. Dunkley, professional nurse, who was with the testatrix in June, 1915, including June 12th, says

she saw nothing the matter with her mind on the day she executed the will.

Rev. Dr. Burkhardt testified that Mrs. Green's mental condition was normal and all right. Dr. W. W. Dunn, who was Mrs. Green's physician frequently, in the absence of Dr. Howle, says he always found her mind unusually clear; that he never questioned her mental condition, and that she was very intelligent and very accurate in her statements.

[2] As to the charge of undue influence, the evidence shows that Mrs. Green was not a person who was susceptible to undue influence, and that neither of her daughters nor the husband of either of them undertook to suggest to her what disposition she should make of her property in the will, or in the codicil.

The 15th day of June, 1915, was L. G. Chelf's birthday, and all of the testatrix's daughters and sons-in-law were at Dumbarton on that day, but neither of them was in her room when she executed the will. The codicil was executed after she returned to her home in Richmond, in the presence of her daughter, Mrs. Dunn, Dr. Howle and L. G. Chelf.

L. G. Chelf testified concerning the codicil as follows:

"Well, Mrs. Green was rather concerned because she was afraid when she wrote the will that she did not remember some of the other people that she wanted to remember and I think, as it now develops, that she had remembered in her previous will, so she asked if I would bring the will to her. I did, and read it over to her very carefully, item by item. Then she said: 'Now, I want you to fix up a codicil for me and add the following names.' I took a memorandum of the names she wanted to remember, and went to my office and wrote it out and brought it to her, and she copied it in her own handwriting. * * *

"She gave me a list of the people she wanted to put in the codicil. She said that she was afraid that she had omitted some that she intended to include, and she asked me to bring her the will. I read it very carefully to her, and she told me: 'I want you to add these to it.' "

L. G. Chelf says he never at any time suggested to Mrs. Green how she should will her property; that she was sweet, loving and affectionate, but you might as well try to "turn the house over" as to persuade her to do anything she did not want to do. T. Wilbur Chelf testified that she always knew her mind and you could not prevent her from doing anything she wanted to do. Dr. Howle testified that he or one of the other sons-in-law suggested to Mrs. Green the advisability of making a will, but did not suggest to her how to make it or what it should contain; that she had a mind of her own and "knew what she wanted to do as clearly as you gentlemen would."

Mrs. L. G. Chelf testified that her mother was "a woman who was gentle in appearance, but very steadfast in what she wanted to do, and she would allow absolutely no interference when she put her mind to anything."

Mrs. T. Wilbur Chelf testified that "mama would never allow any one to tell her what she ought to do. She had a will of her own."

When Mrs. Howle was asked whether her mother was easily persuaded, she answered: "Absolutely not; she absolutely knew what she wanted to do; she had Scotch blood in her."

Mrs. Dunn testified that her mother was not easily dominated by others; that if she did not approve of your advice she would not take it. She would do her own way. Each of the testatrix's daughters testified

that they never at any time talked to her about her will.

If a person wanted to perpetrate a fraud upon another, he would be unlikely to call to assist him Judge Daniel Grinnan, a leading member of the bar of the city of Richmond, who had served as judge of the Chancery Court of the city of Richmond for ten years, and Doctor William Gordon, a prominent physician and a member of one of the leading families of the city. There is no place in a fraudulent transaction for such men as these.

[3] Petitioner's complaint is that he was not allowed to share equally with the daughters of the testatrix under the will of June 12, 1915. He represented the interest of his father in her estate, and as already pointed out the testatrix surrendered to his father's estate about $45,500, which exceeds the one-fifth of the testatrix's estate which petitioner would have received had the will on June 12, 1915, never been executed. Besides, the testatrix had the right, if she so desired, to distribute her estate in unequal amounts among her children and their descendants.

When the will was read to the testatrix the day she wrote the codicil, if it was not satisfactory to her she would have changed it. On the contrary, as proof that it was written as she wished it to be, she, in express terms, ratified and confirmed it in the codicil.

There is abundant evidence in the record to support the verdict of the jury, and there is no merit in the first assignment.

The other assignments relate to the granting and refusing of instructions.

The court gave the following instructions at the request of the proponents:

"A. The court instructs the jury that every person

over twenty-one years of age and of sound mind is entitled under the law to make a will, and to dispose of his property as he pleases, and to discriminate against or between his next of kin as he may chose. And while the burden of proof is upon those offering a will for probate to show testamentary capacity on the part of the testator at the time the will was executed, yet the court tells the jury that there is in all cases an existing presumption in favor of the testator's sanity and capacity, which is to be taken into consideration by the jury in determining the question of competency.

"B. The court instructs the jury that the testimony of credible witnesses present at the execution of the will is entitled to peculiar weight on the question of testamentary capacity, and that this is especially true of attesting witnesses whose duty it is to ascertain and judge of the testator's mental capacity at the time.

"C. The court instructs the jury that they cannot measure the testator's capacity nor inquire into the wisdom and prudence of her disposition of the property if the jury believe from the evidence that she is legally *compos mentis*, be she wise or unwise, she is the disposer of her own property, and her will stands as a reason for her action. She is under no legal obligation to will her property to relatives, the justice or propriety of the will is not a question for the jury except that they may consider that matter as a circumstance bearing upon the testator's mental capacity. If she is a capable testator, she can will her property as she chooses.

"D. The court instructs the jury that the influence which will vitiate a will must amount to force and coercion, destroying free agency. It must not be the

mere desire of gratifying the wishes of another; that would be a very strong ground in favor of the testamentary act. Further, there must be proof that the act was obtained by coercion or importunity which could not be resisted; that it was done merely for the sake of peace so that the motive was tantamount to force and fear.

"E. The court instructs the jury that neither sickness, old age, nor impaired intellect, even if the jury believe from the evidence that any one or all of them existed in this case, are of themselves sufficient to render void any provision of the writing in controversy on this trial; but if the jury also believe from the evidence that the testator, at the time of executing the same, was capable of understanding the nature of the instrument, and of recollecting the property she was about to dispose of, the manner of disposing of it, and the objects of her bounty, then they must find that she had legal capacity to make a valid disposition of her estate."

The court gave the following instructions at the request of the contestant:

"1. If the jury believe from the evidence and the instructions of the court that the will of June 12, 1915, and the codicil thereto of August 11, 1915, constitute the valid will of Mrs. Green, they should bring in their verdict accordingly, as in that event the execution of such a will effected a revocation of the will of November 25, 1912. If the jury believe from the evidence that the said papers executed in the year 1915 do not constitute the true and valid will of Mrs. Green, and that when she wrote the will of November 25, 1912, she possessed testamentary · capacity, then they should find that the said paper of November, 1912, which is

wholly written and signed by Mrs. Green is her valid last will.

"2. The court instructs the jury that the burden is on the proponents to establish that the paper writings of June 12, 1915, and August 11, 1915, offered by them as the last will and testament of Adeline D. Green, is her true last will and testament, and to do this they must establish to your satisfaction the following facts:

"(a) That the paper offered in evidence and the whole paper was thoroughly understood by the said Adeline D. Green and intended by her to be her last will and testament.

"(b) That at the time of the execution thereof the said Adeline D. Green was of sound and disposing mind and memory.

"3. The court instructs the jury that the test of testamentary capacity is that the testatrix must have had sufficient mind and intelligence at the time the paper writings were executed to understand—

"(a) The nature of the business in which she was engaged.

"(b) To recall the property of which she was attempting to dispose; to know and understand her relations to her blood kin or to others who might have claims upon her and to determine the objects of her bounty and the manner in which she wished to dispose of her estate with sense and judgment.

"And if the jury believe that Mrs. Green did not at the time the papers were executed possess mental capacity to know and understand these things, then they must find against the paper or papers as to which such infirmity existed.

"5. The court instructs the jury that former declarations of the testatrix as to the disposition of her property may be considered by the jury to show her

feelings and affections towards the natural objects of her bounty, and in connection with other evidence, if any, may be considered by the jury to show her mental condition as reflecting upon testamentary capacity.

"7. The jury are further instructed that weakness of intellect, regardless of how it may arise, may render the testatrix incapable of making a valid will, provided such weakness really disqualifies her from knowing or appreciating the nature, effect and consequences of the act in which she is engaged.

"8. The court instructs the jury that direct proof is not necessary to overthrow the will, but any facts or circumstances are sufficient as evidence that will satisfy the jury of the incapacity of the testatrix to make testamentary disposition of her property at the time of the execution of the will.

"9. The court instructs the jury that undue influence is any means employed upon and with testatrix by which, under the circumstances and conditions by which the testatrix was surrounded, she could not well resist and which controlled her volition and induced her to do what otherwise she would not have done.

"12. The court instructs the jury that if Mrs. Green had died without a will, the defendant, Thomas Francis Green, Jr., would have inherited one-fifth of her estate, and that if the will of November 25, 1912, is established he will take one-fifth of her estate subject to the specific legacies mentioned therein, and as this will does not name an executor, he would have an equal right with the other beneficiaries to nominate an administrator with the will annexed.

"13. The court instructs the jury that undue influence can seldom be proved by direct testimony for such influences are usually covert and provable only by circumstances, and the jury can draw any reasonable

inferences which are fairly deducible from all the facts and circumstances which have been established to their satisfaction. If the jury believe from the evidence and under all the instructions of the court that undue influence induced the execution of the testamentary paper on June 12, 1915, they should find against its validity."

[4] A careful consideration of all the instructions granted satisfies us that they are free from error, and that when read together, as they should be, they fairly and sufficiently instructed the jury upon the law applicable to the case. It follows, therefore, that the appellant was not prejudiced by the court's refusal to give other instructions.

It plainly appearing from the record and the evidence given at the trial that the parties have had a fair trial on the merits and that substantial justice has been reached, we find no error for which the decree should be reversed. (Code, section 6331.)

It will be affirmed.

*Affirmed.*