# Richmond

## ANNIE HALL AND DOROTHY MILLER v. HARRY HALL AND OTHERS.

January 18, 1943.

Record No. 2635.

Present, Campbell, C. J., and Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

The opinion states the case.

*Arthur C. Stickley, II,* and *George E. Sullivan,* for the appellants.

*Thomas, Strauss, Backus & May* and *McGroary, Quinn, Keesee & Marshall,* for the appellees.

EGGLESTON, J., delivered the opinion of the court.

Annie Hall and Dorothy Miller, hereinafter referred to as the contestants, filed a bill in the court below, under Code, sec. 5259, as amended by Acts 1934, ch. 339, p. 523, against Harry Hall and others, hereinafter called the proponents, to impeach a paper writing, dated July 1, 1939, which had been probated *ex parte* before the clerk of the court below on August 9, 1940, as the last will and testament of Percy Hall, deceased. The bill alleged that at the time of the execution of the paper writing the purported testator was mentally incapable of making a will. It alleged that another paper writing, dated September 14, 1925, and executed by Percy Hall, in the proper manner, was his true last will and testament. After proper pleadings had been filed, pursuant to the prayer of the bill a jury trial on an issue *devisavit vel non* was ordered. The following issue was submitted to the jury: "Whether or not a certain paper writing dated July 1, 1939, or a certain paper writing dated September 14, 1925, either or both, or any part of either

or both, constitutes the last will and testament of Percy Hall, deceased." The jury's verdict was in favor of the instrument dated July 1, 1939. From a decree sustaining the verdict and establishing that instrument as the true last will and testament of the deceased the contestants have appealed.

Rule 14 of this court provides that, "The opening brief of the appellant (or the petition for appeal when adopted as the opening brief) shall contain", among other things:

"(c) A clear and concise statement of the facts, with references to the pages of the record where there is any possibility that the other side may question the statement. Where the facts are controverted it should be so stated."

A compliance with this plain and simple requirement is of immeasurable help to the court in ascertaining and deciding the questions presented to it. A failure to comply with the rule, especially where the record is lengthy, places on the court an unnecessary burden of which it could and should be relieved by counsel who are familiar with the record.

In the case before us the record contains more than 300 printed pages, including the testimony of thirty-six witnesses during a trial which consumed more than four days. And yet the petition for appeal, which is adopted as the opening brief, does not contain the required "clear and concise statement of the facts," pointing out those which are "controverted" and those upon which the parties agree. While there is a purported "Statement of Facts," in substance this is little more than a recital of facts and circumstances which, despite the adverse verdict of the jury, are most favorable to the appellants.

We take this occasion to remind the profession that this rule serves a real and salutary purpose, and that a failure to comply with it may result in a denial or dismissal of the appeal or writ of error.

The principal assignment of error is that the verdict is contrary to the law and the evidence and is without evidence to support it.

The evidence discloses that Percy Hall was born in England in 1877 and came to this country about 1897. He engaged in business with his brother, Harry Hall, in Washington, D. C., and through the exercise of sound judgment and unusual business acumen amassed a comfortable estate.

In 1923 Dorothy Hall and Annie Hall, two of the testator's sisters who had been living in England, came to this country and from that time until June, 1939, made their home with him. The testator was unmarried and had then retired from business. For a time they lived in Washington but later moved to Arlington county where they resided until the testator died on July 24, 1940, at the age of sixty-three years. Although the sisters were regularly employed while they lived with their brother, they did the housekeeping and marketing for the family. Apparently the three members of the family were devoted to each other and were happy in their home until 1939. In 1925 Percy wrote a will in which he left all of his property to them. He was particularly devoted to Dorothy. While she was in fact his daughter, she had been raised in the family and was generally known as his sister, and we shall refer to her as such.

In 1935 the brother and the two sisters went to England where they stayed several months with or near their relatives. Shortly after their return from England the health of Percy, who was then approximately fifty-eight years old, began to fail. He began to lose weight and complained of severe headaches, and while he had always been a person of strong and independent will, inclined to be intolerant of opposing views, and hot-tempered, he became more nervous and irritable. In the spring of 1936 his trouble was diagnosed as arteriosclerosis with the usual accompaniment of high blood pressure. From that time until his death he was almost constantly under the care of one or more physicians who were in one accord that his trouble was hardening of the arteries and elevation of blood pressure. In the fall of 1935 or the early part of 1936 (the record does not show just

when), he suffered a slight stroke which somewhat impaired the use of his left hand.

In the spring of 1939 Cornelius Miller, a widower who lived in the neighborhood, became attentive to Dorothy, and they were married on June 24, 1939, while Percy was in a local hospital. Although Miller had theretofore been a friend of the family and was welcome in the Hall home, upon the commencement of his attentions to Dorothy, Percy took a violent dislike to him. Due to his attitude Dorothy did not tell Percy of her approaching marriage.

When Percy returned from the hospital and was informed of the marriage, which had taken place on the previous day, he was greatly upset, and became very angry not only with Dorothy but also with Annie, who was sympathetic with the marriage. As evidence of Percy's anger and rage he applied obscene and vulgar epithets to his sisters and told various neighbors and intimate associates that he was going to change his will and disinherit both of them. Within a week of the marriage he ordered Annie to leave the home. This she did, first taking refuge at the home of a neighbor and later making her home with Dorothy (Mrs. Miller) and her husband. In the meantime, Harry, an elder brother, had become a member of the household and continued there after the two sisters had left.

Shortly before Dorothy's marriage Percy sought the advice of an attorney in Washington with reference to changing his will. After the marriage this purpose became fixed in his mind, and within a week the will was drawn, executed and properly witnessed in the attorney's office on July 1, 1939. In this will, which is the subject of the present controversy, Percy bequeathed to each of the sisters, Dorothy and Annie, the sum of one dollar. His remaining property he devised and bequeathed to his surviving brothers and to his other sister, Mrs. Duxbury, who, along with the executor, are the proponents of the will and the appellees here.

For some weeks after the will had been executed Percy's anger and resentment toward his sisters, Dorothy and Annie, was unabated. During this time he spoke freely of his

troubles to his neighbors and associates. He openly declared that he had rewritten his will and had disinherited the two sisters.

About three or four weeks after Annie had left her brother's home he sent for her and asked that she return and keep house for him and their brother, Harry. She took this offer under consideration but later declined it because, as she testified, it would have been impossible for her to have cared for her ailing brother and to have continued with her employment.

In the meantime Percy's anger toward Dorothy had likewise apparently abated. She and her husband lived in the neighborhood and pursuant to a telephone message she went to see her brother. From this time on until his death, and despite his former mistreatment of her, she visited him daily and ministered to his needs. Seemingly his affection for her returned and on each occasion when she left he kissed her goodbye.

In July, 1940, Percy's condition became so serious that he was taken to a hospital where he died on the 24th of that month. An autopsy showed that his death was due to the bursting of an internal artery. It also showed that he was suffering from an incipient cancer of the stomach, which, however, did not contribute to his death.

So much for the uncontroverted facts. We come next to the subject of the testator's mental capacity which is the crux of the case and as to which the evidence is conflicting.

Brewster H. Marshall, a member of the District of Columbia Bar, and an Assistant United States Attorney, was the draftsman of the will. He testified that the will was drawn after two conferences with the testator. The first of these took place early in June, 1939, and before Dorothy's marriage. At that time the testator told him that he was thinking of changing his will in view of his sister's contemplated marriage. The second conference took place at Mr. Marshall's office after the marriage. At that time the will was dictated in the presence of the testator and carried out his directions as to the disposition of his property.

After a final draft of the will had been made it was read to the testator who understood it and was "entirely satisfied" with it. He discussed with Mr. Marshall the details of the will and spoke of the fact that he had warned his sister, Dorothy, that if she married he was going to change his will. He spoke of his brother, Charles, one of the beneficiaries, who lived in England, and was concerned over what part, if any, of Charles' share would be taken by the British Government in case the money was sent to him there.

Joseph L. McGroary, a member of Mr. Marshall's firm, who was named as executor in the will, testified that he saw and talked with the testator on the day the will was executed, that "Mr. Hall was perfectly normal and perfectly all right and he knew exactly what he was doing and what he wanted. He discussed not only this will, but discussed the world situation, discussed his brother in England and events which he felt were rapidly leading up to a war at that time and what the United States would do."

Sylvester W. Keesee, likewise a member of Mr. Marshall's firm, was one of the attesting witnesses. He testified that previous to the execution of the will he and the testator "sat around and talked in the office for an hour or an hour and a half about various and sundry things", and that "He talked in a normal, rational manner."

Mrs. Catherine Bilyue, the other attesting witness, was the stenographer who typed the will from Marshall's dictation. She confirmed her employer's statement that the will was dictated in the testator's presence and was later read and understood by him.

From May, 1936, until the date of the testator's death, on July 24, 1940, he was examined and treated by six physicians who testified before the jury. While all of them agreed that during this period the testator was suffering from high blood pressure and hardening of the arteries, and that this was an incurable and progressive disease or condition, five of them were of opinion that it did not impair his mental faculties and that he was all the while quite rational and entirely competent to make a will.

Dr. Leon S. Gordon, who treated the testator from February, 1937, until his death, and who saw him fifty-three times in that period, testified that the testator discussed "business matters" and investments with him, that he was well informed and "very clear" on these subjects. It was Dr. Gordon's opinion that while the testator was physically weak, his "mental faculties were always normal", and that he was "perfectly capable mentally of changing his will" in June and July, 1939. He further testified that while the testator spoke of his troubles with his sisters, and was much embittered and angered thereby, he was nevertheless rational and fully cognizant of what he was doing.

In the month of June, 1939, and while Dr. Gordon was absent from his office, the testator was treated by Dr. Herman S. Hoffman. Dr. Hoffman testified that he discussed with the testator the latter's medical history, background, daily life, work, social activities, etc., and that he seemed in no way to be "mentally retarded," but on the contrary was "quite keen mentally" and was "quite capable of taking care of his affairs, financial and otherwise." He further testified that, in his opinion, during the period of his treatment of the testator the latter was competent and capable mentally of making a will. It is quite significant to note here that Dr. Hoffman last saw the testator on June 28, 1939, just three days before the will was written.

Dr. Melvin R. Nicholson saw the testator five times in the months of July and August, 1939. It was his opinion that the arteriosclerosis and high blood pressure from which the testator was then suffering did not impair his "mind and judgment," but on the contrary that he was "entirely rational and lucid" and discussed "general affairs" in a normal manner.

Dr. Moses Paulson, who examined the testator at the Johns Hopkins clinic in July, 1937, testified that the testator's high blood pressure did not in any way affect his mind and that he showed no signs of any mental disorder.

Dr. William D. Claudy, who saw the testator upon his admission to the hospital at the time of his last illness, testi-

fied that even then his mental capacity, recollection and memory "seemed to be excellent".

Of the six physicians who testified that they had seen or treated the testator during the three years next preceding his death, only Dr. J. Edward Payne was of opinion that he was not "mentally competent" to make a will during the particular period of his treatment. It is worthy to note here that Dr. Payne was the first of these physicians to treat the testator. His treatment extended from May 28 to December 9, 1936, or from two and one-half to three years before the date on which the will was executed.

At any rate, the conflict in the medical testimony has, of course, been settled by the jury's verdict.·

We have frequently said that in determining the mental capacity of a testator, great weight is to be attached to the testimony of the draftsman of the will, of the attesting witnesses, and of attending physicians. *Jenkins* v. *Trice*, 152 Va. 411, 421-427, 147 S. E. 251, and cases there cited. Here the jury has heard and has accepted the testimony of just such witnesses.

In addition to such testimony we have that of other and disinterested witnesses which sustains the jury's finding of the testator's mental capacity.

Alva H. Brooks, a neighbor, who was engaged in the real estate and insurance business and carried insurance on the testator's property, testified that the latter frequently came into his place of business and discussed matters with him. This witness found the testator to be a man of "good business judgment" up until shortly before he died, and one who was well informed on current affairs, investments and real estate. He further said that shortly after the testator's return from the hospital, and following Dorothy's marriage, the testator spoke of buying certain real estate, and that at that time he was "absolutely normal, rational and sane." This witness also testified that while the testator was very angry because of Dorothy's marriage, he was, nevertheless, rational and normal and in sound mind.

Alvin A. Pheiffer, a next-door neighbor, who had known the testator for fifteen years and was a frequent visitor in his home, testified that the testator told him of the change in his will on the day it was executed. This witness said that because of his fondness for the two sisters he remonstrated with the testator as to the change in the will, but that the testator, while angry, was very firm in his determination. He was of opinion that the testator was on that occasion mentally capable of taking care of his ordinary business affairs, that he was capable of comprehending the property which he owned and what disposition he desired to make of it. He also testified that he visited the testator several days before his death and that even then his mind was rational and normal. Mrs. Pheiffer corroborated the testimony of her husband.

The county treasurer testified that he visited the testator in the summer of 1939 and solicited his vote, and that on this occasion the testator talked rationally and acted normally.

Four of the beneficiaries, including three of the testator's brothers and a sister, Mrs. Duxbury, testified to the mental capacity of the testator. Their evidence shows that the testator not only took care of his own business affairs up to the time of his death, but he also advised his brothers and sister concerning theirs.

It is true that in addition to the testimony of Dr. Payne, to which we have referred, the contestants produced that of a number of witnesses from which the jury might have inferred that the testator was not mentally competent to make the will in question. These witnesses included relatives and a number of neighbors and associates. We note here in passing that while both of the sisters, the contestants, testified, neither expressed the opinion that their brother was mentally incompetent to execute the will which is before us.

However unsympathetic we may be with the testator's act in disinheriting his sisters under the circumstances stated, we can not escape the conclusion that there was ample evidence to support the jury's finding that he was mentally competent to make a testamentary disposition of his

property. Indeed, we find that the verdict is in accord with the great preponderance of the evidence.

As we have many times said, the question of mental capacity on conflicting evidence is one for the jury, and where the issue has been fairly submitted on proper instructions neither the trial court nor this court may disturb the verdict. *Bruce* v. *Elliott*, 168 Va. 490, 495, 191 S. E. 654, 656, and cases there cited.

The next assignment challenges the correctness of certain specified instructions which were granted at the request of the proponents. It is said that, "In giving instructions 6C, 7, 10, 11 and 12, the court introduced such confusion in the minds of the jury as to nullify instructions A, B and C which were also given, which last-named correctly charged the jury, and the essential propositions laid down in them were virtually treated as of no consequence in instructions 6C, 7, 10, 11 and 12."

This is the extent of the argument on the alleged "confusion" in the instructions challenged. Neither in the briefs nor in the objections in the court below do the contestants undertake to point out the alleged confusion. We are thus invited to compare the challenged instructions and those granted at the request of the contestants and determine, if we can, wherein the confusion lies. This is not a sufficient assignment of error such as is required by Code, sec. 6346, and Rule 14 of this court. See *Nicholas* v. *Harnsberger, Adm'r*, 180 Va. 203, 22 S. E. (2d) 23.

In the court below it was objected that Instructions 6C, 7, 10, 11 and 12 contained "reiterations prejudicial to complainants". These prejudicial reiterations were not pointed out in the objections below "with reasonable certainty" as is required by Rule 22 of this court. Neither are they mentioned in the assignments of error although they are referred to as "obvious repetitions" in the appellants' reply brief. Again, we must decline to accept the invitation to examine the instructions mentioned and seek out the "reiterations prejudicial to complainants" or the "obvious

repetitions" which counsel have not taken the trouble to point out.

But aside from the appellants' failure to point out the alleged defects in Instructions 6C, 7, 11 and 12, we find that the identical instructions have been approved by this court in *Huff, Ex'r* v. *Welch*, 115 Va. 74, 78 S. E. 573; *Green* v. *Green's Ex'rs*, 150 Va. 452, 143 S. E. 683; and *Jenkins* v. *Trice, supra.*

■ Complaint is made of the opening sentence of Instruction 10 which told the jury "that the right of a testator to dispose of his estate as he likes depends neither on the justice of a prejudice nor on the soundness of his reasoning." It is argued that the words "soundness of his *reasoning*" were likely to be confused by the jury with "soundness of his *reason*", and that hence they might have thought that soundness of the testator's "reason" or "mind" was not essential to his mental capacity to make a will.

The sentence complained of, as well as the next following sentence in the instruction, are taken from a quotation approved in *Wohlford* v. *Wohlford*, 121 Va. 699, 706, 93 S. E. 629. We have frequently pointed out that language appropriate in an opinion is not always fit to be incorporated in an instruction. This is true here. But when the whole sentence is read in its setting, as found in the instruction as a whole, we can not agree that it was likely to confuse the jury. Plainly, the "soundness of his reasoning" refers to the soundness of the testator's logic, deduction, thinking or mental processes whereby he arrived at the conclusion that he should dispose of his property in his will in one manner rather than in another. It could not possibly, we think, have been taken by the jury to refer to the soundness of the testator's "reason" or "sanity." Moreover, the real issue to be decided by the jury was clearly and plainly set forth in the other instructions, and it is manifest that they understood it.

The final assignment of error is that the court erred in denying the contestants the right to open and close the argument before the jury. Here it is said that the contestants

had the burden of proof on the issue of the testator's mental capacity, and hence had the right to open and close the argument. This contention can not be sustained.

In *Redford* v. *Booker,* 166 Va. 561, 569-570, 185 S. E. 879, 883, we said: " * * * The burden of proving testamentary capacity is on the propounder of the will and continues upon him throughout any contest on that question. *Dickens* v. *Bonnewell,* 160 Va. 194, 168 S. E. 610; *Good* v. *Dyer,* 137 Va. 114, 119 S. E. 277. This burden of proof is not to be confused with the burden of producing evidence. That burden frequently passes from party to party during the progress of a trial, but the necessity of proving his case always rests upon the plaintiff and never shifts. *Riggsby* v. *Tritton,* 143 Va. 903, 129 S. E. 493, 45 A. L. R. 280.* Thus upon a case like this, if all the statutory requirements for due execution be shown the legal presumption of sanity comes to the proponents' relief. A *prima facie* case is made out, and the burden then rests upon the contestants to produce evidence if this presumption is to be overcome. *Rust* v. *Reid,* 124 Va. 1, 97 S. E. 324."

In *Kerr* v. *Lunsford,* 31 W. Va. 659, 8 S. E. 493, 496, 2 L. R. A. 668, it was expressly held that upon an issue *devisavit vel non* the proponents of the will have the affirmative of the issue and the right to open and conclude the argument.

On the whole we find no error in the decree complained of and accordingly it is

*Affirmed.*

---

*See also, *Commercial Molasses Corp.* v. *New York Tank Barge Corp.,* 314 U. S. 104, 110, 111, 62 S. Ct. 156, 161, 86 L. Ed. 89.