# Richmond

## ROBERT R. EASON, ET AL. v. CAMILLUS F. EASON, ET AL.

January 15, 1962.

Record No. 5274.

Present, All the Justices.

*George E. Allen* (*A. A. Bangel; Allen, Allen, Allen & Allen; Bangel, Bangel & Bangel,* on brief), for the appellants.

*James N. Garrett* (*Allen J. Gordon; James N. Garrett, Jr.,* on brief), for appellees, Camillus F. Eason, Lloyd Eason and Stanley G. Bryan, Executors, etc.

*M. T. Bohannon* (*Herbert & Bohannon,* on brief), for appellee, Methodist Home for the Aged.

CARRICO, J., delivered the opinion of the court.

On November 2, 1959, the will of Mary F. Eason, deceased, was admitted to probate in the clerk's office of the Circuit Court of Norfolk County. Samuel W. Eason, Robert R. Eason and James L. Eason, hereinafter referred to as the contestants, filed an appeal from the order of probate, pursuant to the provisions of § 64-74, Code of Virginia, 1950. Camillus Eason, and the other legatees and devisees named in the will, together with the trustees and executors

thereof, hereinafter referred to as the proponents, were served with notice of the appeal and appeared and participated in the proceedings.

A jury was impanelled to hear the appeal and the sole issue presented to the jury, after the introduction of all of the evidence, related to the mental competency of the testatrix. The jury returned a verdict upholding the validity of the will. The contestants' motion to set aside the verdict was overruled and a final decree approving the verdict was entered on June 2, 1960. From this decree we granted the contestants an appeal.

The evidence presented to the jury shows that Mary Frances Eason, who was a retired school teacher, executed the disputed will on October 26, 1959, three days before her death on October 29. She was 88 years of age at the time of her death.

Miss Eason, or Miss Mary as she was generally known, left a sizeable estate consisting of stocks, currency and large tracts of land at Hickory, Virginia. She left surviving her as her next of kin a brother, James L. Eason, or La Salle, and two nephews, Samuel W. Eason, of Summit, New Jersey, and Robert R. Eason, of Buena Vista, Virginia, both of whom are doctors.

In the will in question, Miss Eason stated that she had already sufficiently provided for La Salle, but left $1,000.00 in trust for his burial; she provided for the two employees on her farm; she made provisions for the care of her family burial ground; she devised a farm of 100 acres to Camillus F. Eason, a distant cousin, and a namesake of her deceased brother of whom she had been very fond. All the rest of her property she left to charitable institutions, including the Norfolk General Hospital and the Methodist Home for the Aged, except that she bequeathed to her two nephews the sum of $5.00 each, stating in her will that she was "reminded of the unkind treatment shown" to her by them and was also "reminded of the monies which they took from me."

Numerous letters, written by Miss Mary to her two nephews over a period extending from 1952 to shortly before her death, were introduced into evidence. These letters, together with the oral testimony, show that prior to 1956 she was affectionately attached to the nephews and intended that they should have her property. In fact, on September 14, 1953, she executed a deed conveying her real property to them, and although this deed was never recorded, she mailed it to Robert Eason on May 10, 1955.

In 1954, she made a gift of $4,800.00 in cash to Samuel Eason.

Miss Eason had supported her brother La Salle for many years, providing him with food and a place to live on her farm. His only income was a pension of $101.00 per month. It is apparent from the testimony that Miss Mary had the usual sisterly affection for La Salle. However, in 1954, when La Salle was in his 80's, he married a woman to whom Miss Mary took a violent dislike.

Although Miss Mary sided with La Salle, even paying his attorney's fees in subsequent non-support and divorce proceedings, she never forgave him for his marriage. She was so outspoken in her dislike of La Salle's wife that she became fearful that a suit would be brought against her for slander or alienation of affections and that her property might be in jeopardy as a result thereof. In May, 1955, she called in her two nephews for consultation and advice.

It was suggested by the nephews that she convey her property to them, which she did by a deed dated May 2, 1955, reserving a life estate and the right to harvest all growing crops.

On October 24, 1955, Miss Mary executed a will in which she stated that she was making no provision for La Salle as she had provided many comforts for him in the past. The will devised all of her estate, except for certain personal property, to her two nephews. On January 12, 1956, she established savings accounts in the sum of $8,100.00 each, for her two nephews and had the deposit books therefor forwarded to them by the banks. At the trial they denied any knowledge of the execution of the will, at the time, and denied any knowledge of the deposits until they received the deposit books.

In December, 1955, Miss Mary consulted an attorney, Thomas H. Willcox, Jr., concerning her tax liability arising from the transfer of her property to her nephews. At a conference with Miss Mary and the nephews the attorney advised that since the deed of May 2, 1955, had reserved the growing crops, she still held title to the timber on the land. He suggested that Miss Mary should sell the timber to the two doctors who in turn would give her seven promissory notes for $6,000.00 each, payable over a period of seven years, and that if she wished she could make gifts to the nephews of the notes as they became due and thus reduce the tax liability.

Mr. Willcox advised the nephews that they should have evidence to show that Miss Mary was competent to convey the property and timber to them. Accordingly, they took her to Dr. Marvin S. Herrington, who had previously treated her, and to two bankers with whom she had transacted business. Each of these gentlemen signed written

statements attesting to Miss Mary's ability to handle her business affairs.

On March 1, 1956, Miss Mary executed a deed conveying the timber to Samuel and Robert Eason and they delivered to her seven non-interest bearing and non-negotiable notes.

Thereafter, Miss Mary learned that her nephews had advertised a sale of the timber and she voiced vigorous objection thereto. At this point her letters to them took a turn from the affectionate note previously displayed to one of accusation and distrust. She asserted that the conveyance of her land to them had been made with the understanding that it would be re-conveyed to her when her trouble with La Salle's wife had terminated.

On April 27, 1956, Miss Mary filed a sworn bill of complaint against her nephews alleging that the conveyance of her land on May 2, 1955, had been made in trust, to be held by the nephews at her will and to be re-conveyed to her upon her request. The bill further alleged that the deed to the timber had been procured through duress, coercion and undue influence. The bill prayed that a re-conveyance of the land to her be decreed and that the timber deed be declared null and void.

This suit was compromised by Miss Eason and her nephews and an agreement was entered into as a result of which a sale of the timber was consummated for $57,000.00. Pursuant to the agreement and a decree approving the same, the proceeds of the sale, less a sales commission of $2,850.00, were paid into court. From this fund $7,500.00 was paid to the attorneys for the nephews, $5,000.00 to Miss Eason's attorney and the balance of $41,650.00 was paid directly to Miss Eason. The nephews re-conveyed the land to Miss Eason, and she agreed that she would execute a will devising it to them. She surrendered the notes for $42,000.00 that had been given to her by the nephews for the timber.

Following the settlement of the suit, Miss Eason wrote the nephews demanding to be released from her agreement to devise her property to them. She constantly accused them of having stolen her land and money, and insisted that she had made the conveyances to them upon their promise to re-convey to her.

In April, 1957, a crucial exchange of correspondence took place between Miss Eason and her nephews. On April 2 she wrote to Samuel Eason and asked that he and Robert sell her one acre of the land which was subject to the agreement to devise. She stated that

she wanted to "build me a small home so I can say its mine" rather than "to live in the big house alone and only life estate."

On April 12 Samuel Eason sent her the following letter:

"Dear Aunt Mary:

"I wrote to Robert about you acquiring the lot to build on. He refused your request. There is nothing more I can do about it. Received your last letter. I am sorry bitterness remains in your mind. I think it is for the best that I stop writing or phoning. Best wishes, Sam."

On the bottom of this letter Miss Eason had written, "I wanted to fix a little home for my brother. This is his reply."

Following this refusal by the nephews, Miss Eason's letters to them became more harsh and accusing and her demands that they release their claim to her land became more forceful. She threatened to bring suit against them where they resided, and had an attorney write them that such action would be taken. Finally, on October 22, 1957, Robert Eason executed an agreement releasing her from the agreement to devise, providing therein that she would be free thereafter to make a devise, so far as his interest was concerned, to whomever she might elect. Samuel Eason executed a similar release on November 11, 1957.

On December 2, 1957, Miss Eason prepared, wholly in her own handwriting, and executed a will which was identical, in its provisions concerning the disposition of her property, with the will in dispute in this case.

Miss Eason's last illness, congestive heart failure, had its onset in the early part of October, 1959. She was thereafter confined to her bed until her death. On October 23, she requested Camillus Eason, one of the proponents, to bring an attorney to her so she could be certain that her affairs were in final order. He secured Stanley B. Bryan, theretofore unknown either to him or Miss Eason, who went to her home in company with Camillus on October 24. In private consultation with Mr. Bryan, Miss Eason showed him her will of December 2, 1957, and questioned him concerning its validity, impressing upon him her concern that her two nephews would contest her will upon her death. Mr. Bryan gave her his opinion that the will was valid but suggested, in order to avoid any "confusion," that a new one be drawn which would be properly witnessed. She accepted his advice and pursuant to her instructions he prepared the will in

dispute, which she executed in the presence of three witnesses on October 26, 1959.

The principal assignment of error presents the question of whether the evidence was sufficient to sustain the jury's verdict.

Although the contestants concede that Miss Eason was generally of sound mind, their position is that she was suffering from delusions, or paranoia, when the will was executed. They say that her feelings toward her brother and her nephews were based upon false beliefs, but for which she would have devised her property to them.

The contestants argue that although the evidence relating to Miss Eason's sanity was in conflict, there was no conflict in the evidence showing she was suffering from delusions. They say, therefore, that the trial court should have ruled, as a matter of law, that the will was the product of the delusions and thus invalid.

We cannot agree with this contention.

Forty-four witnesses testified in the six day trial of this case. They included doctors who had treated or had had some contact with Miss Eason, attorneys and other business people with whom she had transacted affairs, relatives, friends, an employee, and persons with whom she had had some type of difficulty over the years. Their testimony and opinions, together with the exhibits that were introduced, picture Miss Eason as a person of robust health for her age, strong intellect and pronounced likes and dislikes.

The witnesses presented by the contestants depicted her as being insane, suffering from paranoia and completely incapable of handling her affairs. This evidence enumerated many instances, on her part, of acts of extreme eccentricity, of whimsical statements and confused and fearful thinking.

On the other hand, the witnesses for the proponents testified that she was sane and competent to make a will. They denied that she suffered from paranoia or labored under delusions. This evidence tended to explain and justify many of her eccentricities.

It is worthy of note that of the 26 witnesses called by the contestants only three were doctors. They each testified that Miss Eason was a paranoiac. Two of these doctors were the nephews. The third had only treated her on one occasion, for a bile ailment. His other contacts with her involved personal disputes between them. The proponents presented five doctors, including the doctor who treated her during her last illness, all of whom testified that she was sane and free of paranoia.

There was thus presented to the jury conflicting evidence on the issue of Miss Eason's competency to make a will, and specifically as to her alleged delusions concerning her brother and nephews.

We have said many times before that under such circumstances it is for the jury to determine such an issue, and where the case has been fairly presented and there is credible evidence to support the conclusion reached by the jury, neither the trial court nor this court may disturb the verdict. *Bruce* v. *Elliott*, 168 Va. 490, 495, 191 S. E. 654; *Hall* v. *Hall*, 181 Va. 67, 78, 23 S. E. 2d 810; *Tate* v. *Chumbley*, 190 Va. 480, 504, 57 S. E. 2d 151.

Credible evidence, in fact the great preponderance of the evidence, sustains the jury's finding that Miss Eason was not suffering from delusions concerning the contestants when she made her will.

■ ▌ Where a will is attacked on the ground that it is invalid because the testator suffered from a delusion, it must be shown that the alleged delusion was an insane one and that the will was the product thereof. *Johnson* v. *Johnson*, 105 Md. 81, 65 A. 918, 919; 57 Am.Jur., Wills, § 80, p. 90.

To be sufficient to destroy a testator's capacity to make a will, the delusion must be such as to take hold of his mind and reason and control and influence him to do that with his property which, in the absence of the delusion, he would not do. *Jenkins* v. *Trice*, 152 Va. 411, 444, 147 S. E. 251; *In re Alegria's Estate*, 87 Cal.App. 2d 645, 197 P. 2d 571, 576; *Doyle* v. *Rody*, 180 Md. 471, 25 A. 2d 457, 460, 94 C.J.S., Wills, § 18, pp. 713-715.

But where, in his will, a testator omits someone who might be a logical beneficiary, or leaves him merely a token bequest, doing so because he feels under no obligation to such person, or because he dislikes or distrusts him, and if it appears, as in the case before us, that there is a reasonable basis for the testator's feeling, it cannot be said that the will is the product of a deluded mind. And this is true even though the testator may be mistaken in his feelings, or draw wrong conclusions from the facts, or misinterpret the actions of the omitted person. *Owen* v. *Crumbaugh*, 228 Ill. 380, 81 N. E. 1044, 1051; *In re Bickner's Estate*, 259 Wis. 425, 49 N. W. 2d 404, 408; *Martin* v. *Thayer*, 37 W. Va. 38, 16 S. E. 489, 492, 493; 57 Am.Jur., Wills, § 82, p. 92.

The refusal of the trial court to set aside the verdict of the jury was clearly without error.

■▌ The contestants next say that the trial judge erred in refusing

to admit certain testimony of J. McBryde Webb and Thomas H. Willcox, Jr., both attorneys at law.

These witnesses, offered by the contestants, had represented and advised Miss Eason over a period of years. However, neither of them had been her attorney for more than a year prior to the execution of the will of October 26, 1959.

The ruling of the learned trial judge permitted these witnesses to testify as to any papers they may have prepared for Miss Eason, as to any transactions or conversations they may have had with her in the presence of others, and to give their opinions of her mental competency based upon such contacts with her. They were not permitted to testify as to any transactions conducted in private with her, nor to give their opinions concerning her competency based upon these private matters. The judge based his ruling upon the privilege ordinarily attached to the attorney-client relationship.

We have previously held that an attorney, who has participated in the preparation and execution of what is alleged to be a last will, may be permitted to testify concerning his transactions with the testator in connection therewith. *Hugo* v. *Clark*, 125 Va. 126, 135, 99 S. E. 521.

We have not, however, had presented to us the question of whether an attorney, whose relationship with the testator has terminated, may testify to the matters sought to be introduced by the contestants. We have not had cited to us, nor have we found, any case where such a question has been passed upon in another jurisdiction.

In any event, assuming, but not deciding, that the offered evidence was admissible, such evidence would have been merely cumulative. It could not have changed the only proper and just verdict that should have been reached and which was reached by the jury in this case. The exclusion of this evidence was not, therefore, reversible error, if, indeed, it was error. *Thompson* v. *Camper*, 106 Va. 315, 318, 55 S. E. 674; *Gordon* v. *Va. Elec. & P. Co.*, 150 Va. 442, 451, 143 S. E. 681.

■ As a corollary to this assignment of error, the contestants contend that Mr. Webb should have been permitted, when his testimony was vouched for the record, to read from a memorandum prepared by him of his transactions and conversations with Miss Mary. It is the argument of the contestants that Mr. Webb sought to use the memorandum to refresh his recollection, to enable him to testify.

This contention is without merit. A careful reading of the ruling of the judge discloses that the witness was only precluded from testifying by directly reading the memorandum. He was not restricted, in any way, from referring to the memorandum to refresh his memory and thereafter testifying to the matters upon which his memory had been refreshed.

■ In their next assignment of error, the contestants say that the trial judge erred in refusing to admit the testimony of Robert C. Barclay, III, an attorney at law, who would have testified to the chain of title to the land devised by Miss Eason. This evidence was offered to show that Miss Eason had inherited the land.

The offered testimony was clearly inadmissible. The issue before the jury was Miss Eason's competency to dispose of her estate by will. The source from whence her land may have come was completely irrelevant to that issue. As long as she knew what land she owned, which knowledge plainly appears from the will itself, and also was able to recognize the objects of her bounty and their claim upon her, as the jury was instructed and as it found, she was free to dispose of the land as she wished, regardless of the origin of the title thereto. *Portner* v. *Portner's Exrs.*, 133 Va. 251, 263, 264, 112 S. E. 762.

■ The contestants finally say that the court erred in granting instructions V and VII and in refusing instruction III-B.

Instruction V told the jury:

"The Court instructs the jury that the evidence of physicians, especially those who attended the testatrix, Mary F. Eason, and were with her considerably during her last illness, is entitled to great weight and is especially so in the case of the physician attending the testatrix through her last illness when the will was executed."

Instruction VII read as follows:

"The Court instructs the jury that the testimony of witnesses present at the execution of the will is entitled to peculiar weight on the question of testamentary capacity and that this is especially true of witnesses attesting the will."

These instructions were amply warranted by the evidence. Similar instructions have been approved by this court, when based upon similar evidence, on numerous occasions. *Huff* v. *Welch*, 115 Va. 74, 86, 78 S. E. 573; *Green* v. *Green's Ex'rs*, 150 Va. 452, 462, 466, 143 S. E. 683; *Jenkins* v. *Trice, supra*, 152 Va. at pp. 440, 441; *Culpepper* v. *Robie*, 155 Va. 64, 68, 85, 86, 154 S. E. 687.

The contestants, however, urge us to depart from our prior de-

cisions and adopt a new view, a view which would involve our abandoning the principles outlined in these instructions.

We cannot accede to this request. The rules set forth in the quoted instructions, as applied to a case such as the one before us, have too long been a part of the law of this Commonwealth and are too firmly founded upon logic and justice to be changed, as it were, in the middle of the contest.

Instruction III-B would have told the jury:

"The Court instructs the jury that if the jury believe that the attesting witnesses to the paper writing in question had no previous acquaintance with the decedent, were not selected by her, and nothing was said or done by her at the time to indicate her then mental condition, then their testimony as to the decedent's mental capacity at the date of the execution of the will should not be given any more weight than any lay witness who was not an attesting witness."

In view of what we have said concerning instructions V and VII, and in further view of the fact that instruction III-B was not supported by the evidence, it was properly refused.

This case has presented the sad picture of a lonely woman, aged but able, disillusioned but not delusioned, who has said twice in writing, once on December 2, 1957, and again on October 26, 1959, clearly and forcefully, what was to be done with her property on her death. She has, by her last will, directed that her estate should go where she strongly intended that it should go, and that it should not go to the contestants. The evidence affords a proper situation for the use of the words of Mr. Justice Holt, in *Tabb* v. *Willis*, 155 Va. 836, 862, 156 S. E. 556:

"One man should not dictate, change or annul another's will either in court or out. The preservation of the privilege of making one's own will brings to the old and helpless a consideration which might not otherwise always be extended to them, and should not be whittled away."

Accordingly, the decree is

*Affirmed.*