## Richmond

W. M. Lewis, Executor, Etc. v. Virginia Ann Hunt Roberts, Et Al.

January 16, 1967.

Record No. 6310.

Present, All the Justices.

*Robert T. Vaughan* and *Frank N. Slayton* (*Easley, Vaughan and Slayton*, on brief), for the plaintiff in error.

*Don P. Bagwell* and *James E. Edmunds* (*Tuck, Bagwell, Dillard and Mapp*, on brief), for the defendants in error.

Snead, J., delivered the opinion of the court.

This appeal by W. M. Lewis, executor of the estate of Elizabeth Hunt Overbey, deceased, resulted from the entry of a judgment in

accordance with a jury verdict holding, among other things, that Mrs. Overbey died intestate on June 14, 1964.

On June 16, 1964, a paper writing bearing date of October 8, 1962, purporting to be the last will and testament of Mrs. Overbey was admitted to probate by the Clerk of the Circuit Court of Halifax County. The next day a purported codicil to the will, dated December 23, 1962, was likewise accepted by the clerk for probate and admitted to record. Her estate was valued at approximately $350,000. On July 20, 1964, Francis Watkins Hunt and Virginia Ann Hunt Roberts, the sole surviving children and the sole heirs at law of decedent, contestants, filed a bill of complaint pursuant to Code, § 64-84 against Lewis, the executor, and all other interested parties challenging the validity of the will and codicil. They prayed that an issue *devisavit vel non* be made up and tried by a jury; that probate be set aside; that the writings be declared not to be their mother's last will and testament; and that the jury determine whether any of the paper writings that may be produced was Mrs. Overbey's last will and testament.

The probated non-holographic will and holographic codicil, along with two former non-holographic wills mentioned below and made by Mrs. Overbey, were submitted to the jury for their consideration. In a will executed on April 9, 1956, she devised and bequeathed all of her estate to her two children. In a later will executed on April 7, 1961, Mrs. Overbey bequeathed the sum of $5 to each of her two children and the remainder of her property was devised and bequeathed to Wachovia Bank and Trust Company, trustee under a certain trust agreement she had on the same day executed with that institution for the education of her nieces and nephews with final distribution to her brothers and sisters. The probated will executed on October 8, 1962, contained the identical provisions of the April 7, 1961 will except that Lewis was appointed executor in lieu of executors named in the former will. The probated codicil merely provided for the disposition of several items of furniture.

The jury returned a verdict in these words: "We, the Jury, upon the issues joined, find that none of the paper writings signed by Elizabeth Hunt Overbey and involved in this suit is her last will and testament."

The trial of the case consumed two weeks. The printed record is voluminous and contained in its 677 pages is the testimony of 62 witnesses. The witnesses included medical doctors, psychiatrists,

psychologists, business associates, attorneys, friends and relatives. Their testimony as well as the numerous exhibits introduced presented a conflicting picture of Mrs. Overbey's mental condition.

The witnesses produced by the proponents indicated that Mrs. Overbey was not psychotic, but was a shrewd business woman who successfully engaged in numerous, complex business transactions and was capable of handling her own affairs. Further, that she possessed considerable knowledge of antiques and flowers and kept a tastefully decorated home. While it was admitted that Mrs. Overbey had a drinking problem, there was evidence that when she was not drinking, she was perfectly competent in all respects and in fact, refused to transact business while she was drinking. Also, there was testimony of attesting witnesses that at the time of the execution of the wills in question Mrs. Overbey appeared to be sober and normal in all respects.

Since the jury verdict was rendered in favor of the contestants and approved by the court, the contestants are entitled to have the evidence stated and accepted in the light most favorable to them. *Adams* v. *Allen*, 202 Va. 941, 945, 121 S.E. 2d 364, 368. The evidence may be summarized in part as follows:

Mrs. Overbey's first husband, Watkins Glen Hunt, died in 1947 leaving her the family home "Periwinkle Hill", located outside of South Boston, as well as other property. In 1949, decedent married Dudley Overbey who took up residence with her at "Periwinkle Hill." No children were born of this union. Subsequently, Mrs. Overbey began to drink heavily which eventually caused her husband to have her admitted to the psychiatric ward of the Medical College of Virginia in June of 1953 and again in August of 1953 under the care of Dr. Merritt Foster, a psychiatrist. Dr. Foster at that time diagnosed Mrs. Overbey as being psychotic. He further concluded that, while alcohol was an immediate problem, it was the manifestation of a deeper problem characterized as "involutional depression" which apparently had its beginning following a hysterectomy performed in 1951. He further concluded that continued excessive drinking would tend to worsen the condition.

Following her release, Mrs. Overbey continued to drink to excess and at times engaged in irrational conduct. During March 1956, the problem became acute, and she was then admitted to "Westbrook Psychiatric Hospital" in Richmond in a semiconscious state. During this period of hospitalization, she was under the care of Dr.

Thomas F. Coates, a psychiatrist, and was also examined and tested by Charles A. Peachee, Jr., a clinical psychologist.

Dr. Coates diagnosed her as being psychotic with involutional depression and paranoia. Further, "there were signs or indications she probably had underlying feelings and ideas that people were against her * * * and we felt that as time went on she would get worse if not treated." Dr. Coates also concluded that the "mental condition was the cause of the alcoholism" and that continued excessive drinking would make the condition worse. Mr. Peachee, after giving Mrs. Overbey psychological tests, concluded that she was psychotic with both paranoid and schizoid characteristics.

On March 28, 1956 Mrs. Overbey left Westbrook "against medical advice but with medical consent." Following her return home, she executed on April 9, 1956 one of the wills that was submitted to the jury wherein she left all of her property to her children without mentioning her husband or her marital status. Three days after the execution of this will, she separated from her husband and later obtained a divorce decree.

Mrs. Overbey's continued excessive drinking caused her daughter, Virginia Ann, to resign a position at the Medical College of Virginia and to live with her mother in South Boston. Virginia Ann accepted employment as a teacher in the Halifax Schools. Mrs. Overbey would often become grossly intoxicated and wander about disheveled and disoriented. Virginia Ann attempted to stop her mother from drinking. She even slept on the floor in front of her mother's door to prevent her from getting out and harming herself, but Mrs. Overbey would often crawl out of windows and wander in the woods. Also, Mrs. Overbey became violent and antagonistic toward her daughter. On one occasion she attacked Virginia Ann with a broken bottle, and on another she locked her out of the house and bit her on the leg as she was attempting to re-enter.

In September 1956, following a European trip, Mrs. Overbey registered in a New York hotel under the name of "Mrs. Thomas" and began to drink heavily. Her son and daughter, upon receiving word that their mother was "in bad shape", immediately drove to New York and brought Mrs. Overbey home. Upon her return, Mrs. Overbey continued excessive drinking and "had gotten quite out of hand". Consequently, on September 23, 1956, following an attempted suicide by taking an overdose of drugs and upon being advised by

doctors that it was "the best place", Virginia Ann sent her mother to Eastern State Hospital in Williamsburg for treatment.

Following her release from Eastern State, Mrs. Overbey became increasingly hostile toward her children and in March of 1957, upon returning home from school, Virginia Ann learned that the house was closed, the locks had been changed, and all of her clothing had been "dumped" in the yard of Francis Hunt, her uncle.

Thereafter, Virginia Ann lived with her uncle and aunt until she married Dr. Lucien Roberts, a local obstetrician. Mrs. Overbey's son Francis remained in college but also made his home with his uncle and aunt during vacations. From this point until her death, Mrs. Overbey objected to seeing her children. However, Virginia Ann always came to her mother's aid on those occasions when she needed attention or when she had harmed herself.

After the children were excluded from the family home, it was learned that Mrs. Overbey had locked herself in a motel room in Ft. Lauderdale, Florida. Virginia Ann and her uncle went there and found her mother "irrational" after having been drinking for a long time. Upon her mother's refusal to come back to Virginia or to enter a hospital there, Virginia Ann secured a nurse for her and then returned with her uncle to South Boston.

Immediately upon her return, Virginia Ann received a telegram, dated April 5, 1957, from her mother stating that she was "feeling fine" and sending her love. However, without any intervening communication, she wrote Virginia Ann a letter the next day accusing her of threatening to kill her while in Florida.

In December of 1957, just after Francis had reached the age of 21, Mrs. Overbey executed an instrument whereby she delivered to her children shares inherited by them from their father's estate. The value of each share was approximately $25,000.

On December 20, 1957, Mrs. Overbey went to Danville and executed a will leaving each of her children $5.00 "because they had been amply provided for by their father." This is the first document disinheriting the children, but it is not in issue because a signed copy could not be found.

Throughout this time Mrs. Overbey continued to drink. Finally, on March 28, 1958, it was necessary to have her admitted to Tucker's Hospital in Richmond. She was released from Tucker's on April 11, 1958. Two days later, Mrs. Overbey attempted suicide by attaching a hose to the exhaust of her car and placing it inside

the vehicle with the windows closed. She was found unconscious by a friend who summoned aid. Also discovered were two notes of similar content written by Mrs. Overbey to each of her children, one of which read:

"I killed my own mother,
"Virginia Ann
"I want you to read this every day and night.
"May God have mercy on your soul
"Mother.            April 13, 1958."

During this period Mrs. Overbey was treated for alcoholism by Dr. N. G. Wooding, a local general practitioner. Dr. Wooding, who received special psychiatric training in the army, concluded upon the basis of his examination that Mrs. Overbey was not sane.

In August of 1958, the two children received a letter from W. M. Lewis, attorney for Mrs. Overbey, stating that they were "not to come on her property any more". There had been no confrontation or correspondence that would explain Mrs. Overbey's action. In fact, a week before, she had written a letter to her daughter expressing appreciation for the help that she had given her.

Mrs. Overbey was committed to Eastern State in September and again in November of 1958. In January of 1959, she sent letters to her children stating that because they had sent her to a mental institution, she was disinheriting them.

In August and October 1959, Mrs. Overbey was taken to Hope Harbor Hospital For Alcoholism near Richmond for treatment on four separate occasions at the instance of her daughter, and in November 1959, she was taken to the Texas Clinic in Dallas, Texas for treatment at the instance of other close relatives.

In March 1961, Mrs. Overbey met her real estate agent, W. B. Caldwell, and requested that he go with her to the home of Francis Hunt, her brother-in-law with whom her children were living. Caldwell stated that Mrs. Overbey appeared sober and normal, but when she entered Hunt's home she began cursing, drew a pistol and threatened Hunt because he had been "telling lies on her". A struggle ensued during which Mrs. Overbey was disarmed, and it was learned that the gun was a non-lethal blank pistol.

Later, in March of that year, Mrs. Overbey, for no apparent reason, sent her daughter a news clipping dealing with the be-

trayal of Jesus Christ by Judas Iscariot with the notation that Virginia Ann and her brother, as well as their uncle and aunt, read it every night. Also written on the clipping were these statements: "This is how you sold my heart, body and almost soul" and "Nobody could break my heart again. My own son and daughter cut it out."

On April 7, 1961, Mrs. Overbey executed a will (in issue) in Durham, North Carolina, containing the same disinheriting clause as the Danville will of 1957. Also executed at this time was a trust instrument with the Wachovia Bank and Trust Company.

In June of 1961, Mrs. Overbey was admitted to St. Albans Hospital in Radford for treatment. In July she was again committed to Eastern State and thereafter transferred back to St. Albans.

In the fall of 1961, Virginia Ann attempted to secure approval from her mother for her marriage to Dr. Lucien Roberts. While repeated efforts were made to see Mrs. Overbey, she refused to talk with the couple and wrote her daughter letters stating that she should see her lawyer if there was any business that needed to be transacted. Finally, after all efforts to see her mother had failed, Virginia Ann had her uncle and aunt make the announcement of her marriage.

For several months during the spring of 1962, Mrs. Overbey hung from a tree in her back yard a likeness of a man which she explained represented some person that she hated. She told a surveyor that characters in a picture on the wall of her home sometimes "would come out of the picture to talk to her."

In September of 1962, her daughter, Virginia Ann, gave birth to her first baby. On October 8, 1962, Mrs. Overbey executed the testamentary writing that was admitted to probate as her last will and testament. In this document she again disinherited her children by leaving them $5.00 each and made no mention of her new grandchild. On October 12, Mrs. Overbey wrote her daughter returning a picture of her baby stating that "I hope I never have to see him." Further, on October 15, she wrote an abusive letter to her brother-in-law, Francis Hunt, whom she had previously assaulted with the blank pistol and who had had a heart attack, stating that she wanted him to have more heart attacks and "die the most miserable death imaginable."

At Christmas of that year, a gift from Virginia Ann on behalf of her child was returned with a note on the greeting card stating: "All

I have ever asked of you was to please let me forget that I ever had a child or grandchildren."

In March of 1963, Mrs. Overbey was taken by her daughter to the Roanoke Rehabilitation Center for treatment. While at the Center she received electric shock therapy. During May of that year, Mrs. Overbey appeared at the home of Sheriff C. T. Coates disheveled but apparently sober, and took some newspaper clippings out of a bag and "said she was the Ambassador to France and she was intending to visit the Ambassador of some other country." In addition, she displayed a piece of a postal card on which she had taped a finger nail and said that "she wanted me to see what Francis Hunt had done to her."

During the summer of 1963, Mrs. Overbey was again taken to the Roanoke Rehabilitation Center for treatment. Virginia Ann was subsequently notified that her mother had left the hospital against medical advice. Eight days after leaving it she was found at Hope Harbor Hospital For Alcoholism near Richmond.

During December of 1963, a friend, Paul Edmonds, observed Mrs. Overbey crawling in the snow beside the highway. She explained that she was going to get groceries. Edmonds thought she "definitely" had not been drinking. He testified: "I have never seen such an expression on anyone's face, to be frank with you. It was cold-hard and her eyes did not look right."

In May 1964, Mrs. Overbey was visited on business by her accountant, John Hereford. She told Hereford that she was leaving that afternoon by plane to attend her brother's funeral in Mobile, Alabama. Hereford testified that she was not normal at the time, and that when he next saw Mrs. Overbey she said that her brother was not dead.

Between April 1963 and June 1964, Mrs. Overbey was hospitalized seven times under the care of Dr. William Brann, a local practitioner. On five occasions she was admitted under the influence of barbiturates and treated for drug poisoning. Dr. Brann construed these episodes as suicide attempts and concluded that Mrs. Overbey was a "schizophrenic person who has a type of insanity as a basal condition."

Finally, on June 14, 1964, Mrs. Overbey, according to Dr. Geoffrey T. Mann, Chief Medical Examiner for the Commonwealth of Virginia, committed suicide by drowning. The act was accomplished by wrapping around her neck a television antenna wire and

chain which had a weight attached and throwing herself into the lily pond behind her house.

Appellant makes 15 assignments of error in which it is contended, in substance, (1) that the jury's verdict was contrary to the law and the evidence and without evidence to support it; (2) that the court erred in admitting and refusing certain evidence; and (3) that the court erred in granting and refusing certain instructions.

The critical and controlling issue presented is whether there was sufficient credible evidence adduced to sustain the jury's finding that Mrs. Overbey lacked mental capacity to make any of the wills involved in this suit.

There were numerous witnesses, both lay and professional, who testified on behalf of the contestants as to Mrs. Overbey's insanity. Five general practitioners who had treated her on occasions between the late 1950's and the time of her death concluded that she was insane. Two psychiatrists and a psychologist, who had personally examined and administered tests to her, testified that she was psychotic. In addition, members of Mrs. Overbey's family, friends and other persons testified as to her unfounded hatred towards her children as well as to delusions and other irrational behavior.

Mrs. Overbey's condition and mental capacity were summarized by Dr. Merritt Foster, a psychiatrist, who testified in response to a detailed hypothetical question which he had previously read and studied. The question contained the material evidence adduced describing her background, hospitalizations, behavior and actions. Dr. Foster concluded:

"Q. * * * [A]ssuming the foregoing facts to be true do you have an opinion as to the sanity or insanity of the testatrix during said period of time and particularly on or about the dates of said wills?

"A. Yes, sir.

"Q. What is your opinion?

"A. I would say that individual certainly lacked testamentary capacity and was incompetent.

"Q. Would you call her sane or insane?

"A. I would call her insane.

"Q. In your opinion was the said disinheritance by her of her children in those wills a result of said mental condition you have just described?

"A. I would think so, yes.

"Q. Doctor, would a woman with this mental condition that you

have described have the capacity insofar as her children were concerned to dispose of her estate with sense and justice?

"A. I think her attitude would be warped and she could not use good judgment and sense as far as these children were concerned."

Upon consideration of all of the evidence in a light most favorable to contestants, the prevailing parties in the court below, we cannot say as a matter of law that there was insufficient evidence upon which the jury could have based its verdict.

As previously stated, the evidence was conflicting on the issue of Mrs. Overbey's competency to make a will. "We have said many times before that under such circumstances it is for the jury to determine such an issue, and where the case has been fairly presented and there is credible evidence to support the conclusion reached by the jury, neither the trial court nor this court may disturb the verdict. *Bruce* v. *Elliott*, 168 Va. 490, 495, 191 S.E. 654; *Hall* v. *Hall*, 181 Va. 67, 78, 23 S.E. 2d 810; *Tate* v. *Chumbley*, 190 Va. 480, 504, 57 S.E. 2d 151." *Eason* v. *Eason*, 203 Va. 246, 253, 123 S.E. 2d 361.

In our view it will unduly prolong this opinion and will serve no good purpose to discuss the remaining assignments of error which relate to the admission and refusal to admit certain evidence and the granting and refusing of instructions. Suffice it to say that we have carefully examined all of the assignments of error and find them to be without merit.

Accordingly, the judgment appealed from is

*Affirmed.*