## Richmond

### THEODORE THOMASON IN HIS OWN RIGHT AND AS EXECUTOR OF THE ESTATE OF MAUDE L. THOMASON

v.

### ARLENE VIRGINIA CARLTON, RALPH R. LESTER, JR., BRENDA LESTER CATHERWOOD

March 6, 1981.

Record No. 781610.

Present: Carrico, C.J., Harrison, Cochran, Poff, and Compton, JJ.*

---

\* Mr. Chief Justice I'Anson presided at the oral argument of this case but retired on January 31, 1981.

*Charles R. Warren, Jr.* (*Warren, Parker, Williams & Stilwell,* on brief), for appellant.
*Daniel L. Manson* for appellees.

HARRISON, J., delivered the opinion of the Court.

The issue in this case is whether Mrs. Maude L. Thomason, who died on November 3, 1975, when she was approximately ninety-one years of age, possessed testamentary capacity on March 23, 1973, when she executed her will. Arlene Virginia Carlton, a daughter of the testatrix, filed a bill of complaint against Theodore Thomason, son and executor of the testatrix, to set aside the will. On an issue *devisavit vel non* a jury found that Mrs. Thomason did not have testamentary capacity, and its verdict was affirmed by the trial court. Theodore Thomason noted this appeal.

Maude Thomason was survived by a son, Theodore Thomason, a daughter, Arlene Virginia Carlton, and two grandchildren, Brenda Lester Catherwood and Ralph R. Lester, Jr., children of Nettie Mae Lester, a deceased daughter. The will involved in this proceeding was prepared by an attorney and was executed on March 23, 1973. In this will Mrs. Thomason devised all her property to Theodore, with the provision that should Theodore not survive the testatrix, her estate was to be held and disposed of by the Schoolfield Bank and Trust Company of Danville, Virginia as trustee. The trustee was directed to use the corpus and/or income therefrom for the use and benefit of Mrs. Carlton. Upon Mrs. Carlton's death the residue was to be divided among the grandchildren of the testatrix who survived Mrs. Carlton.

Mrs. Carlton contends that Mrs. Thomason suffered a paralyzing stroke in 1969, and remained totally incapacitated until her death. In support of her allegation that her mother did not possess testamentary capacity, Mrs. Carlton relies on the testimony of several of the decedent's neighbors, that of Mrs. Carlton's daughter and nephew, and her own testimony.

Mrs. Hazel Scearce and Mrs. Maggie Matthews had known Mrs. Thomason for a period of some twenty-five to thirty years. Scearce described Mrs. Thomason as "a very smart and sensible woman." She related a conversation she had with Mrs. Thomason in 1967 in which the decedent said that "should something happen to her, that Arlene would have a home and would be well taken care of." Mrs. Scearce said that Mrs. Thomason had a stroke in 1969 and that "[s]he never knew me after she had the first stroke in '69." Scearce stated that Mrs. Thomason's mind wandered, that she could not do things for herself, and that Mrs. Thomason did not work in the store she owned after 1969. On cross-examination, however, Mrs. Scearce's answers indicated that she was not in fact an intimate of the decedent or the Thomason family. She did not know that Mrs. Carlton had attempted to have a guardian appointed for her mother, that Mrs. Carlton had been institutionalized twice, or that Mrs. Carlton had been ordered

by the court to stay away from her mother. Mrs. Scearce also admitted that there had been some unpleasantness between her daughter's mother-in-law and Theodore.

Mrs. Matthews testified that after Mrs. Thomason's stroke in 1969 the testatrix would not recognize her and would look at her and say, "Who are you." She said that prior to 1969 Mrs. Thomason told her on two occasions that she would leave the residence to Mrs. Carlton. She also said that she saw Mrs. Thomason after March 1973, and that she "just didn't seem to realize what it was all about" and did not recognize her. However, she further testified that she believed that she had seen Mrs. Thomason working in her store after March 1973, and that most of the time Mrs. Thomason would be sitting in the store. When asked the condition of Mrs. Thomason's health from 1973 to 1975, Matthews responded "it didn't seem so good to me."

Mrs. Faye Wells, a daughter of Mrs. Carlton, testified that she thought her grandmother had been taken to the hospital "around in 1969, with some type stroke or threat of stroke, and since that time, she had gone down-hill very fast." Mrs. Wells maintained that her grandmother was in very poor mental condition, that she deteriorated after entering the hospital in March 1973, and that Mrs. Thomason did not consistently recognize her. This witness stated that the testatrix had indicated to her that "my mother would be provided for, and she would have a home there, as long as she lived." Mrs. Wells acknowledged there had been a conflict between her mother and her uncle Theodore and said that her mother was a "very sick woman physically" and "she should have her part of this will."

Jesse Jones lived in Mrs. Thomason's neighborhood, but it is impossible to determine from his testimony the exact time or period during which he had contact with her. He testified that in 1973 he "spoke to her once sitting in the store there, and she didn't seem to know me." He also said she did not recognize him in 1969, although she had known him for forty years.

Arlene Carlton testified that before 1969 her mother was alert and a very active person. She spoke of the "original will" shown her in 1968 by her mother, which allegedly provided that Mrs. Carlton "would get the home place." She testified that her mother had a stroke in 1969 and that thereafter "her mind would go and come." Mrs. Carlton described the March 1973 illness as "the severe stroke" and said that when she visited Mrs. Thomason in the hospital in March 1973 her mother did not recognize her and afterwards "was not aware of anything, really."

Although Ralph R. Lester, Jr., grandson of the testatrix, was called

by Mrs. Carlton, he contradicted the testimony of the witnesses who claimed that Mrs. Thomason suffered a stroke in 1969 and was thereafter incompetent to execute a will.[1] Lester is an airline pilot by profession and was wounded while serving in Vietnam. Upon his return home in 1970, he visited with his grandmother, and they "talked about various things." He said that he visited her again in 1971 or the first part of 1972, and "she was just as sharp and clever and working hard, and controlling her. . .affairs, in a very smart manner. . .very intelligent person." Lester testified that his grandmother "was a very healthy person, to my estimation. . .[v]ery active, and clever, and quick, and she wrote letters better than I could." When asked if Mrs. Thomason was "in full control of her affairs," he answered, "[s]he appeared that way to me. She wrote letters and was intelligent." He said she had no trouble recognizing him immediately.

To establish the competency of the testatrix appellant called Mrs. Thomason's family physician, the attorney who prepared her will, the subscribing witnesses thereto, and others having personal knowledge of her condition on March 23, 1973.

Dr. Henry R. Bourne, a Danville physician, testified that Mrs. Thomason had been his patient from 1950 until her death in 1975. He stated that he had treated her numerous times for various complaints and said "I never saw Mrs. Thomason when I did not think she was mentally capable." He said that she was an invalid, was very feeble, had heart trouble and arthritis, but that she was, to the best of his knowledge, "mentally alert and knew what she was doing." When asked if the testatrix was "mentally competent to know what property she may have had or who her heirs or children were," he answered "I think she was competent. Yes, I think she knew exactly what she was doing." He testified that Mrs. Thomason was admitted to the hospital on March 15, 1973, and at that time he wrote "[s]he seems quite weak, but her mind is remarkably good." He stated that he made the notation, "She was mentally alert" because Mrs. Thomason "was alleged to have had a stroke." When asked what his medical records and notes indicated on March 24, 1973, he responded, she was "discharged improved."

Dr. Bourne was asked specifically if Mrs. Thomason had had a stroke in 1969. He responded that he had no record or any knowledge

---

[1] Ralph R. Lester, Jr., and Brenda Lester Catherwood were made defendants to Carlton's amended bill of complaint but filed no answer. After trial in the court below counsel for Carlton was discharged by her, and no brief has been filed here in her behalf. However, counsel has filed appellees' brief on behalf of Brenda Lester Catherwood and Ralph R. Lester, Jr.

that she had ever suffered a stroke in 1969 or at any time prior to the "slight stroke" for which he treated her between March 15, 1973, and March 24, 1973. A review of her medical records revealed that Dr. Bourne treated Mrs. Thomason for a number of injuries and illnesses, none of which would have affected her mental competency. In summary, Dr. Bourne testified: "I saw this lady and she was never disoriented as to time, place or person."

The will of Mrs. Thomason was prepared by Robert M. Davis, a member of the North Carolina Bar with offices in Salisbury, North Carolina. His wife is a niece of the testatrix. Davis testified that he had known Mrs. Thomason since February 1971, when she visited in his home after a funeral. He said that thereafter and until her death they exchanged visits on a number of occasions. Davis testified that in early 1973 his wife, who works in his office as a legal secretary, received a letter from Mrs. Thomason in which she expressed the desire that they prepare a will for her. Davis had a number of conversations with Mrs. Thomason in person and over the phone regarding the contents of the will and received written instructions from her regarding the instrument. He stated that the will was prepared exactly as she asked him to prepare it, "I only did what this lady, in the mail, and on the telephone, and in person, in visits, asked me to do." He stated that she had explained to him why she was leaving her property to Theodore. Davis testified that he was present in the hospital room when the will was executed by Mrs. Thomason, that she read the will and said that it was exactly what she wanted and signed it in the presence of the two subscribing witnesses. He said that on March 23, 1973, Mrs. Thomason knew the extent of her estate, the houses that she owned, the money that she had in the bank, and who her children were.

Davis testified that Mrs. Thomason remarked to him that Theodore had taken care of her, lived close to her, and was there regularly. Davis stated that Mrs. Thomason indicated to him that if Mrs. Carlton were left property, it "would be gone immediately," and "none of it would be left." He said fear prompted Mrs. Thomason to dispose of her estate in the manner that she did. "She wanted Theodore to use his good judgment as to what could be done" for Mrs. Carlton. Davis also observed that it was Mrs. Thomason who supplied the name of a bank in Danville, with which he was not familiar, to serve as trustee if Theodore predeceased her. Davis testified that in a letter which Mrs. Thomason wrote him in early 1973, she mentioned the fact that she was then having a house built for her nieces (Mrs. Stranahan and Mrs. Shorter) because they were selling their houses and moving in behind her.

In 1972 Mrs. Thomason, who was then in her late 80's, requested her two nieces, Viola Stranahan and Mozelle Shorter, to give up their homes and to move into a house that Mrs. Thomason proposed to build in her backyard. The parties agreed to the arrangement and to pay $50 a month rent. The house was built by Mrs. Thomason, with Theodore's help, between December 1972 and April 1973. Thereafter it appears that the nieces assisted Theodore in caring for the testatrix. Stranahan testified that after moving into the house on April 6, 1973, she helped Mrs. Thomason bathe and saw her "every day." The two nieces attested the execution of the will by Mrs. Thomason. Stranahan said that Mrs. Thomason read the whole will, understood what she was signing, and stated, "That's exactly the way I want it." Both witnesses testified that there was no question whatever about her mental capacity. Mrs. Shorter said that had there been she would never have witnessed the will, while Stranahan stated that her aunt was lucid until the date of her death. Shorter described Mrs. Thomason as a strong willed woman who "knew exactly what she wanted."

The store that was formerly operated by Mrs. Thomason was rented to W. W. Mitchell during the last five years of Mrs. Thomason's life. Mrs. Mitchell testified that she would see Mrs. Thomason in the store "just about every day," that Mrs. Thomason did not have any trouble recognizing her, and that she did not see "much wrong with her mind. She would forget things like most everybody...like I will, and most everybody else."

During the month of April 1975, Mrs. Carlton initiated a proceeding to have a guardian appointed for her mother. Lewis E. Goodman, Jr., a member of the Virginia Bar practicing in Danville, was appointed guardian *ad litem* to protect Mrs. Thomason's interest in the proceedings. Goodman testified that he and Judge Stuart Craig, then the presiding judge of the court below, visited Mrs. Thomason at her home in connection with the proceeding. Goodman described the Thomason home as "immaculately kept," and said that "[s]he was extremely mentally alert and understood all of our questions, and expressed what her desires were in regard to the handling of her affairs. ...She was very definite in her answers, and very adamant in her positions on what she wanted." He stated that he and Judge Craig discussed with Mrs. Thomason her property, how she handled her business affairs, and what her desires were. He further stated that they also discussed the people who had been to visit her, what she ate and who cooked for her, whether she cooked for herself, how she kept house, and even "how she got the new curtains." Goodman was asked specifically "did she have the mental capacity to be aware of the prop-

erty and the beneficiaries of her bounty, and to be aware of what she wanted done with her property?" He responded "[n]o doubt in my mind she was aware of all these . . . the nature of her property, and who the heirs were."

Following this visit by the circuit judge and the guardian *ad litem*, Judge Craig, on May 7, 1975, entered an order appointing Theodore Thomason as committee of the estate of Maude L. Thomason. The order expressly recited that the appointment was "due to the age of the said Maude L. Thomason and her inability to personally handle her business affairs because of physical disability and not because of mental disability, . . . such being the desire and wish of the said Maude L. Thomason as expressed to the Court."

We find no evidence in this case of undue influence, fraud, coercion, or overreaching. Theodore Thomason apparently played no part in having his mother execute the will in controversy. His testimony was brief and restrained. It concerned principally the family problems and conflicts with his sister, who Dr. Bourne said "has been mentally ill for a long time."

We are not concerned here with a will that was executed immediately prior to the death of a testatrix or even during a last illness. Mrs. Thomason lived over two years and eight months after her will was signed. While she was feeble her condition was not unlike that of any other ninety-year-old person who had heart trouble and had suffered a slight stroke. She was well and foresighted enough to have a house built in her backyard and to persuade two nieces to live there during her declining years. Her condition in April 1975 was so good that she impressed Goodman as being extremely mentally alert, aware of the nature and extent of her property and who her heirs were. Goodman's impression of Mrs. Thomason was judicially confirmed by order of the judge of the court below.

The test applied in Virginia for mental capacity to execute a will emphasizes *ability* to know and do certain things. As stated in several Virginia cases:

> "Neither sickness nor impaired intellect is sufficient, standing alone, to render a will invalid. If at the time of its execution the testatrix was capable of recollecting her property, the natural objects of her bounty and their claims upon her, knew the business about which she was engaged and how she wished to dispose of her property, that is sufficient."

*Tate* v. *Chumbley,* 190 Va. 480, 495, 57 S.E.2d 151, 158 (1950); *Gilmer* v. *Brown,* 186 Va. 630, 639, 44 S.E.2d 16, 20 (1947); *Tabb*

v. *Willis,* 155 Va. 836, 859, 156 S.E. 556, 564 (1931).

Implicit in the requirement of ability of the testatrix to know how she wished to dispose of her property is her ability to interrelate the factors stated in the test to form a testamentary plan. *See* T. Atkinson, *Handbook of The Law of Wills* § 51 (2d ed. 1953); 1 Bowe-Parker, *Page on Wills* § 12.21 (1960).

As the test states, it is the time of execution of the will that is the critical time for determining testamentary capacity. The testimony of witnesses as to the mental capacity of the testatrix at this time carries great weight.

The principles which control our decision here were well stated in *Forehand* v. *Sawyer,* 147 Va. 105, 136 S.E. 683 (1927). There, a sixty-one-year-old testator was married to a seventy-six-year-old wife who for thirty-four years had been a "faithful, frugal wife and carefully managed her household affairs." 147 Va. 107, 136 S.E. 684. Some three or four years before his death the testator became enamoured with another lady. His infatuation grew to such an extent that he executed a will in which he devised his whole estate to this lady, excepting only a pair of mules and an annuity of $200 a year to his wife. The will was assailed on the grounds of undue influence and lack of mental capacity. The verdict of the jury was against the validity of the will, and the trial court affirmed. We reversed, and during the course of his opinion Judge Burks said:

> [T]he testimony of those present at the *factum*—when the will is executed—is entitled to the greatest consideration. The time at which a will is executed is the vital time for mental capacity to exist. If it appears that the testator had mental capacity at that time, it is immaterial what his mental condition was before or after that time. Testimony on the subject of prior or subsequent incapacity is only relevant as tending to show incapacity at the time of execution. It is for this reason that so much importance is attached to the testimony of those who were present at the *factum.* Usually, this weight is attached to the testimony of the subscribing witnesses called by the testator, or with his assent, to witness the will, but if they had no previous acquaintance with the testator, were not selected by him, and nothing was said or done by him at the time to indicate his then mental condition, it is said that their testimony is not accorded the weight which would otherwise attach to it. *Tucker* v. *Sandidge,* 85 Va. 546, 8 S.E. 650; *Chappell* v. *Trent,* 90 Va. 849, 19 S.E. 314. The testimony, however, of a reputable attorney who receives the instruc-

tions for drafting the will, drafts it, reads it over and explains it to the testator, and is present at its execution, is entitled to very great consideration as to the mental capacity of the testator. This is especially true in the absence of any suggestion of fraud, lack of memory or uncertainty as to what transpired, and when not in conflict with the testimony of the subscribing witnesses.

147 Va. at 120-21, 136 S.E. at 688.

In *Thornton* v. *Thornton's Ex'rs,* 141 Va. 232, 126 S.E. 69 (1925), we had occasion to comment on the weight to be accorded the testimony of a subscribing witness as to the testator's mental capacity and held that "it is well settled that the testimony of the subscribing witness at the time of the act is entitled to peculiar weight." 141 Va. 239, 126 S.E. 71. We reaffirmed this holding in *Eason* v. *Eason,* 203 Va. 246, 255, 123 S.E.2d 361, 368 (1962), and approved an instruction there which told the jury that "the evidence of physicians, especially those who attended the testatrix, . . . and were with her considerably during her last illness, is entitled to great weight and is especially so in the case of the physician attending the testatrix through her last illness when the will was executed." *See also Dunn* v. *Strong,* 216 Va. 205, 217 S.E.2d 831 (1975).

The contestants argue that there is conflicting evidence of incompetency and point to the testimony of the several witnesses who said that Mrs. Thomason suffered a stroke in 1969, with the result that she did not recognize her neighbors and was completely incapable of handling her affairs or making a will. Aside from the testimony given by witnesses for the proponents of the will, there is abundant testimony in the record, especially that of Ralph R. Lester, Jr., that Mrs. Thomason was sharp, clever, worked hard, and controlled her affairs in an intelligent manner after 1969 and during the period in which the contestants claim the testatrix was totally incompetent. The record shows that she conducted herself in a manner expected of an aged woman who was still mentally alert and physically able to function.

The will of Mrs. Thomason is not an unnatural will. The immediate family of the testatrix, the persons who would normally be the objects of her bounty, were her son, a daughter, and two children of a deceased daughter. Apparently the son lived in the immediate neighborhood of his mother over a long period of years and had been attentive and dutiful. The daughter, Mrs. Carlton, had no doubt also been attentive, and as supportive as her physical and mental condition permitted. Unfortunately the daughter suffered a mental illness that

required hospitalizations and brought on conflicts which resulted in the intervention of the courts. Testimony given by Dr. Bourne, Mr. Davis, and Theodore Thomason showed that this problem weighed heavily upon Mrs. Thomason. It was said that she finally concluded that it would be unwise for her to make a direct devise or bequest to Mrs. Carlton, that she decided to place her trust in her son and thereupon devised her estate to him. Significantly, she directed that if Theodore did not survive her, a bank was to act as trustee of the estate and was to use the income, and corpus if necessary, for Mrs. Carlton's benefit, with the remainder to the grandchildren at the daughter's death. The will therefore did recognize and make some provision for all members of the immediate family. The will may prove to be an unwise document; her confidence in Theodore, and her belief that he would look after Mrs. Carlton, may have been misplaced. If so, she made a mistake in judgment, but her decision is not evidence of her incompetency.

The attorney who prepared Mrs. Thomason's will had no interest in the outcome of the case. His wife was not a beneficiary under the will, and she would not have inherited if the testatrix had died intestate. The attorney testified unequivocally and clearly that the will involved was prepared in strict accordance with written and oral instructions given him by the testatrix and following numerous conversations, conferences, letters, and telephone calls with her. He said that she was fully competent when she signed the will and that she read it, understood it, and signed it knowingly.

The two subscribing witnesses, Stranahan and Shorter, are nieces of the testatrix and knew her intimately. They testified that Mrs. Thomason read and understood the will, that she even read a portion of the will out loud, and that she was fully competent at the time. These nieces were not prospective heirs-at-law of the decedent or beneficiaries under the will. The record discloses no reason for them to have been biased or prejudiced or to have given false testimony. Mrs. Shorter was most emphatic in her statement that had she entertained any question about Mrs. Thomason's mental capacity she would never have witnessed the will.

Dr. Bourne was not present when the will was executed and apparently knew nothing about it until this controversy developed. However, he is a most material witness because he was Mrs. Thomason's family physician and attended her for a quarter of a century. She was his patient and under his professional care at the time and on the day that the will was executed. At that time she had suffered what the doctor described as a slight stroke. The doctor's records and

notes, made long before any controversy developed over his patient's mental capacity, reflected that at that time, March 23, 1973, she was mentally alert. The physician had no record that this woman had suffered a stroke in 1969. It is most unlikely that Mrs. Thomason, who consulted her physician frequently and for several complaints during 1969, could have had a stroke and not have consulted her doctor. Dr. Bourne had no reservations about the mental competency of this woman to execute her will in March 1973.

The simple issue in this case is mental competency. If Mrs. Thomason was mentally competent on March 23, 1973, she had the right to dispose of her property as she chose, regardless of the opinion of others. We are not unsympathetic to Mrs. Carlton, or to the opinions expressed by her, her daughter, and others that she should receive some benefit from her mother's estate. However, her mother made a decision as to the manner in which her estate should be handled, and she made a judgment as to the most expedient way for the daughter's welfare to be protected. We find the evidence overwhelming that Mrs. Thomason possessed testamentary capacity on March 23, 1973, at the time she executed her will, and that is the critical time for determining testamentary capacity. Under these circumstances we hold the will to be valid.

This case, as was *Eason, supra,* is a proper one to repeat the words of Mr. Justice Holt in *Tabb* v. *Willis,* 155 Va. 836, 862, 156 S.E. 556, 565 (1931):

> One man should not dictate, change or annul another's will either in court or out. The preservation of the privilege of making one's own will brings to the old and helpless a consideration which might not otherwise always be extended to them, and should not be whittled away.

The judgment of the trial court is reversed, the verdict of the jury set aside, and the case remanded to the trial court with direction to admit to probate the will signed by Maude L. Thomason, dated March 23, 1973, as her last true will and testament.

*Reversed and remanded.*

COMPTON, J., dissenting.

The majority says, "The simple issue in this case is mental competency." I disagree. At this appellate stage of the proceeding, the *real*

question is whether there is credible evidence to support the jury's conclusion on the issue of competency.

This Court repeatedly has stated that when there is conflicting evidence on the issue of competency to make a will, the jury must determine that issue. And "where the case has been fairly presented and there is credible evidence to support the conclusion reached by the jury, neither the trial court nor this court may disturb the verdict." *Eason* v. *Eason,* 203 Va. 246, 253, 123 S.E.2d 361, 366 (1962). Furthermore, when, as here, a jury verdict has been rendered in favor of the contestants and has been approved by the chancellor, the contestants are entitled on appeal to have the evidence considered and accepted in the light most favorable to them. *Lewis* v. *Roberts,* 207 Va. 742, 744, 152 S.E.2d 44, 45 (1967).

I submit that the three-member majority in this case has failed to apply both of the foregoing basic rules of appellate review. I think there was credible, substantial evidence to support the jury's finding of fact that Maude L. Thomason lacked testamentary capacity at the time the will was executed.

For example, the testimony of Faye Wells is particuarly strong in support of the contestants' position. Wells, the decedent's granddaughter and a minister's wife who was "very close" to her grandmother, said she saw the testatrix "on or around" the day the will was executed and testified twice that she "was in very poor mental condition." Wells said that based on her conversations with and observations of her grandmother "in 1973," she was "sure" the decedent could not understand the language contained in the will.

In addition, the witness Scearce, who had known the decedent for 30 years, testified that immediately before and after the March 1973 hospitalization, the testatrix did not recognize Scearce. She said that upon discharge from the hospital Mrs. Thomason's mind "just wandered" and that "I would get to talking to her, and she would want to know who I was and what I was doing there."

Also, the witness Mathews, who was a "next door neighbor" of the decedent for 20 to 25 years, stated that she saw Mrs. Thomason "a lot of times" during March of 1973 and that the testatrix did not recognize her. Mathews testified, without objection, that in 1973 the decedent would have been unable to "think about her property," to "think about her beneficiaries," to "think about what she was doing," and to "relate all three of these items together."

The preceding excerpts are representative of the abundant testimony in the record that supports the verdict. This is a classic case in which competent, conflicting evidence, presented in an impartially conducted

trial with proper instructions, renders the jury's finding of incompetency "inviolate against disturbance by the courts." *Smithey* v. *Refining Company*, 203 Va. 142, 145, 122 S.E.2d 872, 875 (1961).

For these reasons, I would affirm the judgment below.

CARRICO, C.J., joins in this dissent.