# CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH

Johnny W. White

v.

James L. Miller
and Gary Samuel White

Case Nos. (Chancery) CH95-3690, CH96-3691

Phyllis D. Bodner
and Kay N. White

v.

James L. Miller
and Gary Samuel White

Case Nos. (Chancery) CH96-3555

April 10, 1996

BY JUDGE KENNETH N. WHITEHURST

This matter [CH95-3690] came to be heard on Respondents' Demurrer to Count II of Plaintiff's Petition in Chancery alleging intentional interference with inheritance.

After hearing oral arguments from counsel and considering the briefs which have been submitted, this Court is of the opinion that the Demurrer should be and hereby is overruled.

The tort of intentional interference with inheritance is recognized by the *Restatement (Second) of Torts*, as well as by many other jurisdictions. While the Virginia Supreme Court has not specifically recognized a cause of action

for intentional interference with inheritance, it has recognized intentional interference with a contractual right which was terminable at will and which is analogous to the case at bar.

The allegations in Count II of Respondents' brief claiming uncertainty regarding the elements and burden of proof for an intentional interference with inheritance cause of action is not grounds for demurrer, and the court may at any time in the future rule on the proper burden of proof. The Court further finds that Petitioner has alleged the necessary elements to meet the requirements for making this claim and that the tort of intentional interference with inheritance is not against public policy.

I request that counsel for Petitioner prepare the appropriate Order overruling Respondents' demurrer.

February 10, 1997

BY JUDGE JEROME B. FRIEDMAN

By agreement of all counsel, these three matters were consolidated for trial by the court. Trial commenced on January 9, 1997, and continued for seven days. Final argument was heard on January 23, 1997. After review of the numerous trial exhibits, extensive trial notes, and the parties' briefs, the court is now prepared to render its judgment.

In 1990, Mildred S. White (hereinafter "the testatrix" or "Mrs. White") won approximately $6.8 million in the Virginia Lottery. She died testate on November 9, 1994, at the age of 79, survived by four children: Johnny W. White, Kay Norman White, Phyllis Dawn Bodner, and Gary Samuel White (hereinafter "Sammy White"). On May 25, 1994, less than six months before her death, the testatrix executed a will and a pour-over trust naming the respondent Sammy White as sole beneficiary of her estate. (Complainants Phyllis Bodner and Kay White were designated in the will as contingent beneficiaries of the testatrix's tangible personal property and as contingent beneficiaries of the trust should Sammy White predecease the testatrix.) The 1994 will was admitted to probate, and pursuant to its provisions, the respondent James L. Miller was duly qualified as executor on November 15, 1994. The evidence before the court establishes that the testatrix had executed a similar will and trust on February 25, 1993, which named her four children and one other individual, Ronald Batliner, Sr., as equal beneficiaries. The 1993 will and trust purportedly were revoked when Mrs. White executed the 1994 will and trust.

In the action designated CH95-3691, complainant Johnny White challenges the validity of the 1994 will, alleging undue influence and lack of testamentary capacity and praying that the testatrix's last prior will be declared valid. In CH95-3690, complainant Johnny White challenges the validity of the 1994 trust, alleging undue influence, intentional interference with an inheritance, unjust enrichment, and lack of capacity to contract. The complainant prays that the last prior trust be declared valid. In CH96-355, complainants Phyllis Bodner and Kay White challenge the 1994 trust on the same grounds. At trial the complainants modified their prayers for relief to ask that all of Mrs. White's wills and trusts be declared void and that her estate be distributed by intestate succession.

### Lack of Testamentary Capacity

The first issue presented by virtue of the *devisavit vel non* proceeding in CH95-3691 is whether the testatrix possessed the requisite testamentary capacity at the time she executed the 1994 will. "Testamentary capacity is the term used to describe the degree of mental capacity required for the valid execution of a will. Code § 64.1-47. It exists if, at the time the testatrix executed her will, she 'was capable of recollecting her property, the natural objects of her bounty and their claims upon her, knew the business about which she was engaged and how she wished to dispose of her property'." *Gibbs v. Gibbs*, 239 Va. 197, 199 (1990), quoting *Tabb v. Willis*, 155 Va. 836, 859 (1931). The proponent of the will, in this case the respondent executor, bears the burden of proving the existence of testamentary capacity. However, once the proponent has proved compliance with all statutory requirements for the valid execution of a will, he is entitled to a presumption that testamentary capacity existed. The contestant then bears the burden of rebutting the presumption by introducing evidence showing a lack of testamentary capacity. *Gibbs* at 199-200.

In this case, the complainants do not dispute, and the evidence clearly establishes, that the statutory requirements were met. The testatrix signed the 1994 will in the presence of at least two competent witnesses, who thereafter subscribed the will in the testatrix's presence. Code of Virginia § 64.1-49. The question then becomes whether the complainant has introduced evidence showing a lack of testamentary capacity sufficient to rebut the presumption created by the statutory compliance.

The basis of complainant's claim of lack of testamentary capacity is that the testatrix had a lengthy history of mental health problems involving several hospitalizations, even electric shock therapy, beginning in the 1940's and

14

continuing through the 1980's. It is undisputed that she took the prescription drug Lithium on a long-term basis until 1990. The complainant called Dr. Paul Mansheim, a psychiatrist, to testify as to Mrs. White's mental condition. Based solely on his review of Mrs. White's medical records, it was Dr. Mansheim's opinion that Mrs. White suffered from a chronic bi-polar disorder that rendered her incapable of possessing testamentary capacity when she executed the 1994 will. When asked by the court, Dr. Mansheim further indicated that Mrs. White would not have posssessed testamentary capacity when she executed the 1993 will either. The respondent's expert, Dr. Donald Mingione, agreed based on the available medical records that Mrs. White suffered from a bi-polar disorder for much of her adult life. However, it was Dr. Mingione's opinion that this disorder is episodic, as opposed to chronic, and that someone suffering from it can go through long periods of time where she is perfectly lucid and capable of managing her own affairs. Dr. Mingione noted that the last time Mrs. White had been hospitalized for this problem was in 1983. Based on Mrs. White's rational involvement in her day-to-day financial affairs and medical treatments in the months leading up to the execution of the 1994 will, it was Dr. Mingione's opinion that she was in the midst of such a lucid period and that she clearly possessed testamentary capacity.

The court is well aware that it is the time of the execution of the will that is the critical time for determining testamentary capacity. The testatrix's mental condition before and after that event is relevant only so far as it tends to show incapacity at the time of execution of the will. *Thomason v. Carlton*, 221 Va. 845, 853 (1981). It is for that reason that great weight must be given to the testimony of the witnesses present at the execution of the will. Further, "the testimony … of a reputable attorney who receives the instructions for drafting the will, drafts it, reads it over and explains it to the testator, and is present at its execution, is entitled to very great consideration as to the mental capacity of the testator." *Id.* at 853-54, citing *Forehand v. Sawyer*, 147 Va. 105, 120-21 (1927). Also entitled to significant weight is the testimony of physicians who treated the testatrix during the relevant time period preceding her death. *Id.*, citing *Eason v. Eason*, 203 Va. 246, 255 (1962).

The court places little value on the evidence concerning the state of Mrs. White's mental health decades before the execution of this will. The court is far more interested in the testimony of the witnesses to the execution of the will, and of the attorney who prepared the will at her direction, and of the health professionals who personally interacted with the testatrix in the months preceding her death. Nothing in the testimony of any of those key witnesses raises any question in the court's mind as to the existence of testamentary capacity at the time Mrs. White executed the 1994 will. Of particular note is

the testimony of the defendant James Miller, an attorney with an exemplary reputation and over thirty years of experience in drafting and overseeing the execution of wills. Mr. Miller had drafted the 1993 will and trust for Mrs. White and had met with and spoken to her on several occasions throughout 1993 and 1994. Mrs. White gave instructions to Mr. Miller about the 1994 changes to her will and trust in several telephone conversations and personal meetings. Mr. Miller testified that at the signing of the 1994 will, Mrs. White was as sharp as she always was and that there was nothing about her conduct that caused any concern on his part about her mental capacity. Marjorie Mahler, Mr. Miller's secretary for thirty-five years, who was present at the execution of both the 1994 and 1993 wills and was the notary on the 1994 will, also testified that Mrs. White was an "ordinary," friendly, chatty person throughout all the times she dealt with her.

The court also places great weight on the testimony of three physicians who treated the testatrix for various medical conditions during 1993 and 1994. Dr. Goldman, an internist, provided general care. Dr. Neff, an orthopedist, treated her for a variety of orthopedic complaints over the years, including a severe fracture of her right shoulder on May 30, 1994. Dr. Bodner (no relation to complainant Phyllis Bodner), an ophthalmologist, performed cataract surgery on the testatrix in 1990 and laser surgery in 1992 and continued to see her on a regular basis for treatment of other eye conditions right up until two weeks before her death. All of these physicians describe the testatrix as an alert, cooperative patient who followed sometimes complicated instructions very well and did a creditable job of keeping track of her various medications, eye drops, exercises, diet restrictions, etc. Dr. Neff in particular credits the testatrix's compliance with his demanding instructions for home care and exercises as being a big factor in her successful recovery from the 1994 shoulder fracture. None of these physicians felt that Mrs. White was mentally incompetent or incapable of handling her own affairs.

Further, there is ample evidence that in the months surrounding the execution of the 1994 will, Mrs. White was actively involved in managing her financial affairs, including writing numerous checks to pay bills and make charitable donations. Two days after the execution of the 1994 will, she wrote a note to Mr. Batliner listing the checks she had written. That note reveals that she knew her exact checking account balance.

The totality of the evidence before the court reveals that the testatrix was a sharp, capable woman who was very familiar with her financial arrangements and possessed very definite opinions. In short, the complainants have presented no credible evidence showing that *at the time of the execution of the will*, the testatrix was incapable of recollecting her property and the natural

16

objects of her bounty or that she did not understand the business she was about and how she wished to dispose of her property. While the testatrix's decision to, in effect, disinherit three of her four children may be harsh and possibly even unfair, it was nevertheless her decision to make.

### Undue Influence

Complainant Johnny White alleges undue influence on the part of respondent Sammy White in the execution of both the will and the trust. Complainants Phyllis Bodner and Kay White allege the same as to the execution of the trust.

Undue influence is a species of fraud and so must be proved by clear and convincing evidence. *Pace v. Richmond,* 231 Va. 216, 224-5 (1986). In order to set aside a testamentary document on the basis of undue influence, the influence must be exerted by a person who has a confidential or fiduciary relationship with the testator, and the influence "must be sufficient to destroy free agency on the part of the testator; it must amount to coercion - practically duress. It must be shown to the satisfaction of the court that the party had no free will." *Id.* at 224, quoting *Wood v. Wood,* 109 Va. 470, 472 (1909). Undue influence will not be found based only on "bare suggestion, innuendo, or suspicion." *Id.,* quoting *Core v. Core's Adm'rs,* 139 Va. 1, 14 (1924).

A presumption of undue influence may arise when it is proved by clear and convincing evidence that: "(1) the testator was enfeebled in mind when the [testamentary document] was executed, (2) the requisite confidential or fiduciary relationship was accompanied by activity in procuring or preparing the favorable [testamentary document], and (3) the testator previously expressed a contrary intention to dispose of his property." *Jarvis v. Tonkin,* 238 Va. 115, 120 (1989).

Of the three elements necessary to create a presumption of undue influence, only the last has been proven in this case. The evidence does establish that prior to the 1994 will and trust, Mrs. White had planned to leave her estate to her four children and Mr. Batliner to be divided equally among them.

As for the first element, there is no clear and convincing evidence that the testatrix was enfeebled of mind. Based on the same evidence discussed in the preceding analysis of testamentary capacity, the court is of the opinion that Mrs. White was quite competent not just on the day she executed the 1994 will and trust, but throughout the 1993 - 1994 time period, when presumably she would have been subjected to the alleged undue influence. In particular, there is no doubt in the court's mind that, had the testatrix been "enfeebled in

mind," such a fact would have been apparent to the health professionals who were in regular contact with her.

As for the second element, it appears that a fiduciary or confidential relationship existed between Sammy White and his mother by virtue of their close parent-child relationship. In 1993 Mrs. White had granted a power of attorney to Sammy White and Mr. Batliner jointly and had designated them as her agents in an advance medical directive. The evidence shows, however, that Sammy White was not even aware of the existence of the power of attorney and advance medical directive until shortly before the testatrix executed the 1994 will. Even assuming that the necessary fiduciary relationship existed, there has been no evidence presented to show that Sammy White was involved in the procuring or preparation of the 1994 will and trust, other than to drive his mother to Mr. Miller's office and sit in on their May 23, 1994, meeting. There is an audio tape recording of a portion of that meeting. The tape reveals that Sammy White's involvement in the meeting was as a spectator and not a procurer. Other than the complainant's bare, uncorroborated allegations that Sammy White abused his mother and controlled her every action, there is nothing to support a finding that the second element has been met.

Based on the above analysis, the court finds that there is no clear and convincing evidence supporting a presumption of undue influence.

### Tortious Interference with An Inheritance

The claim of tortious interference with an inheritance was recognized by Judge Whitehurst of this court when he overruled the defendants' demurrer to Count II of the petition in CH95-3690. (Letter opinion dated April 10, 1996.) Judge Whitehurst based his decision on the Restatement (Second) of Torts, § 774B (1977), which provides, "One who by fraud, duress, or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he otherwise would have received is subject to liability to the other for the loss of the inheritance or gift." It is clear that in order for the complainants to prevail on this claim, they must prove some type of fraudulent or otherwise intentionally tortious conduct on the part of Sammy White. This they have simply failed to do.

The testimony of numerous witnesses was that Sammy White was always "the apple of his mother's eye" and that the other children did not share a particularly close relationship with her. Sammy lived with his mother since 1986, and he appears to have been the one to take the most active part in her life, even before she won the Lotto. The relationship between complainant Johnny White and his mother can best be described as estranged. Johnny

White did not attend the funeral of his father in 1988. He had minimal contact with Mrs. White until she won the Lotto. At one point in 1991, Mrs. White consulted an attorney and had the attorney write a letter to Johnny White advising him that she would press charges if he came on her property. The audio tape of Mrs. White's meeting with Mr. Miller the day before she executed the 1994 will records Mrs. White referring to Johnny White as "that man in Wisconsin." In short, there is no credible evidence establishing that Sammy White exerted duress or coercion over Mrs. White or that he engaged in any type of fraudulent behavior. There is ample evidence, on the other hand, that the provisions of the 1994 will and trust accurately reflect Mrs. White's perception of her relationships with her various children.

### Unjust Enrichment

In Count III of CH96-3690 and CH96-3555, the complainants ask that a constructive trust be imposed on the trust assets. They allege that Sammy White has been unjustly enriched as a result of the undue influence and duress imposed by him on Mrs. White. As discussed *supra*, the court finds insufficient evidence of any wrongful conduct on the part of Sammy White. The provisions of the 1994 trust accurately reflect the testatrix's wishes at the time she executed the document. There is no basis for finding that Sammy White has been unjustly enriched.

### Lack of Capacity to Contract

The final claim for relief asserted by the complainants is that the 1994 trust should be set aside on the grounds that the testatrix lacked the mental capacity required to execute a contract to convey property. "The law presumes that every adult who executes an agreement is mentally competent to enter into a contract." *Drewry v. Drewry*, 8 Va. App. 460, 467 (1989). "[T]he dispositive question is the individual's mental capacity to understand the nature of the agreement and the consequences of his or her act at the time the agreement is executed." *Id.*, citing *Price's Ex'r v. Barham*, 147 Va. 478, 481 (1927). Based on the same evidence considered by the court in addressing the question of testamentary capacity, the court concludes that Mrs. White was capable of understanding the nature of the trust agreement and the consequences of executing the same.

*Conclusion*

Based on the foregoing analysis, the court finds in favor of the defendants on all counts of each of the three pending actions. Mr. Sims is asked to submit a properly endorsed final order granting judgment in favor of the defendants and dismissing these actions. Each party is to pay his own costs.